**ALLSTATE INSURANCE COMPANY, solely as successor-in-interest to Northbrook Excess & Surplus Insurance Company, f/k/a Northbrook Insurance Company, Appellant (Defendant Below),**

v.

**DANA CORPORATION, Appellee (Plaintiff Below).**

No. 49S02–0105–CV–231.

Supreme Court of Indiana.

Dec. 20, 2001.

Max Gray, Indianapolis, Stephen D. Cuyler, Thomas J. Castano, Parsippany, NJ, Robert F. Walsh, Susan M. Chesler, New York, NY, Steven Lovern, Indianapolis, for Appellant.

Steven M. Badger, Insurance Environmental Litigation Association, Indianapolis, Laura A. Foggan, Karalee C. Morell, Insurance Environmental Litigation Association, Washington, D.C., for Amicus Curiae.

George M. Plews, Frederick D. Emhardt, Indianapolis, for Appellee.

Frank J. Deveau, Donald C. Biggs, Julia E. Dimick, Indiana Petroleum Marketers and Convenience Stores Association, Inc., Indiana Manufacturers Association, National Solid Wastes Management Association, Indianapolis, for Amici Curiae.

## ON PETITION FOR TRANSFER

BOEHM, Justice.

This consolidated appeal addresses a number of issues of insurance coverage for environmental cleanup liabilities.

### Factual and Procedural Background

Dana Corporation is a manufacturer of automotive components. Sixty-three of its facilities, located in nineteen states, have become the subject of governmental or third-party actions resulting in substantial environmental cleanup costs. Allstate Insurance Company is the successor in interest to Dana's excess liability insurer in the relevant years. When Dana's liability insurers denied coverage for the cleanup, Dana sued. Several trial court rulings produced an interlocutory appeal in 1997. *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 288 (Ind.Ct.App. 1997), *trans. denied.* In that appeal, the Court of Appeals held: (1) Indiana law governed construction of the policies; (2) the term "suits," as used in the policies, included "coercive and adversarial administrative proceedings"; and (3) the term "damages," as used in the policies, included "EPA or state-mandated cleanup and response costs." *Id.* at 294, 296, 298. In general, these holdings meant Dana was entitled to indemnity for cleanup costs, subject to policy limits and exclusions.

After the first appeal, Dana settled with all of its insurers except Allstate. Although Dana's coverage of at least some cleanup costs was established, a number of issues remained unresolved. These were the subject of a second round of motions resulting in the trial court's entry of judgment for Dana in the amount of $4,599,314.30 as to Dana's facility in Old Forge, Pennsylvania, one of the several sites. Although liability as to the other sites remained unadjudicated, the trial court certified the Old Forge judgment and a number of earlier rulings on partial summary judgments for appeal pursuant to Trial Rule 54(B). Both Allstate and Dana appealed. Each challenged three of the trial court's rulings and defended three others. The Court of Appeals addressed all six in detail, affirming two and reversing four. *Allstate Ins. Co. v. Dana Corp.*, 737 N.E.2d 1177 (Ind.Ct.App.2000). This Court granted transfer.

## Standard of Review

All of the issues in this appeal address Allstate's liability to Dana under excess liability policies issued by Allstate's predecessor, Northbrook Excess and Surplus Insurance Company, for five policy years from 1977 through 1982.[1] The trial court's rulings and judgments were on motions for partial summary judgment by Dana and Allstate.[2] Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Shell Oil Co. v. Lovold Co.*, 705 N.E.2d 981, 983–84 (Ind.1998).

## I. Liability for Property Damage to Ground Water on Dana–Owned Property

Each of the policies provides that Allstate will pay all sums Dana becomes obligated to pay because of liability for damages resulting from "property damage."

Much of the disputed cost is for remediation of contaminated ground water. A primary issue in the trial court and Court of Appeals was whether ground water constitutes property of the landowner, and if it does, whether the policies cover cleanup related to ground water in Dana's own property. Whether Allstate must pay for the costs incurred by Dana in complying with orders to clean up its own property depends on (1) the scope of the policies' coverage grants,[3] and (2) the effect of the policies' exclusions for "property damage" to property owned by Dana. Essentially, the determination of both issues comes down to how "property damage" is defined in each policy.

Other courts have arrived at varying interpretations of similar "owned property" exclusions in the context of claims for costs associated with environmental cleanup orders.[4] We start from

---

1. Dana's policies were issued for annual periods beginning June 1 of each year. We refer to the policy for June 1, 1977 through May 31, 1978 as the 1977 policy.

2. After the first appeal, Dana moved for partial summary judgment against Allstate on issues similar to those already decided by the trial court as to the primary insurers. In addressing Dana's motions, the trial court determined it was not bound by the earlier rulings, but agreed with their conclusions. The Court of Appeals referred to these rulings as disposing of motions for reconsideration of earlier rulings. For simplicity, we treat them as original motions. The record in this appeal begins with Dana's motions against Allstate.

3. The 1977, 1978 and 1979 policies provide the following coverage grant:

 I. Coverage
 The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the insured for all sums which the insured shall be obligated to pay by reason of the liability
 A. imposed upon the Insured by law, or

 B. assumed under contract or agreement by the Named Insured, for damages on account of
 A. Personal Injuries
 B. Property Damage
 C. Advertising Liability, caused by or arising out of each Occurrence happening anywhere in the world.
 The 1980 and 1981 policies provide:
 A. Coverage:
 To indemnify the INSURED for the ULTIMATE NET LOSS, in excess of the greater of the RETAINED LIMIT, or UNDERLYING LIMIT, for all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:
 (1) PERSONAL INJURY,
 (2) PROPERTY DAMAGE, or
 (3) ADVERTISING LIABILITY to which this policy applies, caused by an OCCURRENCE, happening anywhere in the world.

4. Some courts find the exclusion bars coverage when the contamination is solely on the insured's land, but do find coverage when

the proposition that "contracts for insurance are subject to the same rules of interpretation ·as are other contracts. If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning." *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985) (citations omitted). Here, each policy's language does provide an answer, albeit different answers for different policies.

The 1977, 1978 and 1979 policies contain identical language in both their coverage grants and "owned property" exclusions. The 1980 and 1981 policies are identical to each other in this respect, but differ from the first three.

A. *1977–79 Policies*

■ The 1977–79 policies define "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by an Insured) which results in an Occurrence during the policy period." Given this definition of "property damage," these policies provide coverage for:

> all sums which the insured shall be obligated to pay by reason of the liability ... imposed upon the Insured by law ... for damages on account of ... [loss of or direct damage to or destruction of tangible property (*other than property owned by an Insured* )] ... caused by or arising out of each Occurrence happening anywhere in the world.

(emphasis added). Thus, these policies provide coverage for liability resulting from damage to property owned by others, but deny coverage for liability resulting

from damage to Dana's own property. Because there is no liability coverage for damage to Dana's own property, reference to the "owned property" exclusion in these policies is unnecessary.

■ We are uncertain to what extent Dana's claims are based on cleanup of ground water that remained solely within the confines of Dana's property. Under this coverage grant, if ground water in Dana's land is Dana's property, then the 1977–79 policies provide no coverage for cleanup in that category. The Court of Appeals concluded that "[u]nless and until a landowner takes the ground water into actual possession, it remains the property of the State," 737 N.E.2d at 1187, and that because Dana had not taken the ground water into possession, the policies afforded coverage. We disagree with the Court of Appeals' analysis of this issue.

In *Wiggins v. Brazil Coal & Clay Corp.*, 452 N.E.2d 958, 964 (Ind.1983), this Court held that plaintiffs who owned a lake formed from ground water had no cause of action against a strip mining company, where the company's removal of ground water on its property resulted in a lower water level for the plaintiffs' lake. This Court stated, "Ground water is part of the land in which it is present and belongs to the owner of that land." *Id.* This holding derives from the English Rule, or absolute dominion rule, that "ground water is part of the land and the landowner has the absolute right to use the water as he wishes." *City of Valparaiso v. Defler*, 694 N.E.2d 1177, 1179 (Ind.Ct.App.1998). In

---

there is a "threat of harm" to a third party property interest. *See, e.g., Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 498 S.E.2d 492, 495–96 (1998); *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 232 Mich.App. 146, 594 N.W.2d 61, 67 (1998). Others find the exclusion bars coverage for cleanup unless the contamination has leached

onto another's land. *See, e.g., Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1030–31 (2d Cir.1991) (applying Vermont law); *Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 675 N.E.2d 1161, 1164–66 (1997); *New Jersey v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 612 A.2d 932, 938–39 (1992).

*Defler*, the Court of Appeals took *Wiggins* to mean that the plaintiffs had no cause of action because, not having taken it into possession, they had no ownership interest in the ground water on their land. *Id.* at 1181. The Court of Appeals in the present case applied this doctrine, citing *Defler*, to conclude that the "owned property" exclusion did not apply.

We believe the Court of Appeals, here and in *Defler*, misconstrued the holding in *Wiggins* by equating restrictions on ground water use with lack of ground water ownership. *Wiggins* observed that Indiana follows a modified version of the English Rule, in that water "may be put to use to the fullest extent to further enjoyment of the land, *however this right does not extend to causing injury gratuitously or maliciously to nearby lands and their owners.*" *Wiggins*, 452 N.E.2d at 964 (emphasis added). This is not a holding with respect to ownership of the water. Rather, it is a holding that although ground water is the landowner's property, the landowner does not enjoy the absolute immunity for its harmful use that the English Rule would have granted. Otherwise stated, the plaintiffs in *Wiggins* had no cause of action, not because they had no ownership interest in the water in their land, but because the strip mining company was free to do with the water in its land as it saw fit, so long as the resulting injury was not gratuitous or malicious. *Wiggins*, 452 N.E.2d at 964. So viewed, the Indiana modification to the English Rule limited the permissible use of ground water, but did not abandon the common law status of ground water as property of the landowner.[5]

Because any contamination of ground water in Dana-owned land is contamination of Dana-owned property, the 1977–79 policies do not provide indemnification under "property damage" for the cost of treating contamination on Dana's property. The necessary corollary to this principle is that if the ground water has percolated beyond the confines of the landowner's property, it no longer belongs to that landowner. As a result, there is property damage coverage to the extent liability is based on damage caused by contaminated ground water escaping Dana's property or by contamination directly affecting ground water outside Dana's borders. Although we reach this conclusion as to the 1977–79 policies by a reading of the coverage grants, rather than their "owned property" exclusions, we affirm the trial court's denial of Dana's motion for partial summary judgment on this issue.

B. *1980–81 Policies*

■ The 1980 and 1981 policies do not refer to any concept of ownership by others in defining the coverage for property damage. These policies provide indemnification "for all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law ... for damages and expenses, because of [physical injury to or destruction of tangible property]." As to these policies, Allstate relies on the "owned property" exclusion. It states: "This policy shall not apply: ... [u]nder PROPERTY DAMAGE to injury to or destruction of or loss of: (1) property owned by any INSURED...." Allstate contends this exclusion bars indemnification for costs imposed on Dana to clean up contamination at

---

5. We note that the legislature has placed further restraints on the use of groundwater. *See* Ind.Code 14–25–3 (1998). Though these regulations demonstrate the "public policy of the state ... to conserve and protect the ground water resources of Indiana and for the most beneficial use and disposition of ground water resources," *id.* § 14–25–3–3, we do not view them as having altered the common law property status of ground water.

Dana-owned sites. We do not agree. The exclusion states that no coverage exists for the damage to Dana's property, but does not state that no coverage exists for the liability to third parties resulting from that damage.

This difference between claims for property damage and claims for liability resulting from property damage was highlighted in *Unigard Mut. Ins. Co. v. McCarty's Inc.*, 756 F.Supp. 1366, 1369 (D.Idaho 1988). Here, as in *Unigard*, Dana has not asserted claims intended "to restore [its] land for [its] benefit," *id.;* rather, Dana is asserting claims based on its liability to third parties, which is the very purpose for which the policies were procured. *Cf. Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 705 (7th Cir.1994) ("It is a policy of liability insurance, not casualty insurance, on which [the insureds] have sued. They seek to recover the cost of complying with a government order.... The fact that the clean up occurred on their land is irrelevant.").

"It is well settled that '[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer' and the policy language is viewed from the standpoint of the insured." *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000) (quoting *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind.1996)). We think the exclusion can be fairly read to apply only to exclude repair or replacement of Dana's property, not to exclude liability to third parties. Unlike the 1977–79 policies, it does not exclude "damages from" injuries to self-owned property. Given these frequently cited maxims of insurance law, that is enough to confer coverage.

As to the 1980 and 1981 policies, we reverse the trial court and direct entry of partial summary judgment on this issue for Dana.

## II. Personal Injury Coverage

The 1977–80 policies cover liability for damages due to the following "Personal Injuries":

[B]odily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities....

None of the liabilities asserted here is for conventional individual personal injuries. No one has claimed sickness or death resulting from toxic contact. Rather, the liabilities are cleanup costs essentially prophylactic in nature. The trial court, finding the terms "wrongful eviction" and "invasion of rights of privacy" ambiguous, nevertheless determined that Dana's environmental liabilities are covered as falling within these categories of "personal injuries."

### A. *Wrongful Eviction*

██ The Court of Appeals concluded that the term "eviction" "depends upon a relationship between the evictor and evictee of landlord and tenant. It also requires a dispossession of property." 737 N.E.2d at 1199. Therefore, coverage under this term in the 1977–79 policies does not "extend to [environmental cleanup] costs except where a tenant of Dana was compelled to vacate a location because of environmental damage." *Id.* We agree with the Court of Appeals. There is no showing that Dana dispossessed anyone, and we find no coverage for wrongful eviction.

### B. *Invasion of Rights of Privacy*

██ The extent to which the tort of invasion of privacy is recognized in Indiana

is not yet settled. *See Doe v. Methodist Hosp.*, 690 N.E.2d 681 (Ind.1997) (disagreement whether to recognize claim for "public disclosure of private facts"). However, as a general proposition, the tort of "invasion of rights of privacy" has taken four forms: (1) public disclosure of private facts, (2) intrusion, (3) appropriation, and (4) false light in the public eye. *Ledbetter v. Ross*, 725 N.E.2d 120, 123 (Ind.Ct.App. 2000). Of these four, it seems apparent that only the "intrusion" form of the tort could arguably apply.

 "When the invasion of a plaintiff's right to privacy takes the form of intrusion, it consists of an intrusion upon the plaintiff's physical solitude or seclusion as by invading his home or conducting an illegal search." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind.1991) (citing W. Prosser & J. Keaton, Prosser and Keaton on Torts § 117 (5th ed.1984)). Launching a missile onto a person's property may be a tort, but it is, in itself, not an invasion of privacy, however intrusive it may be. The entry of contaminants onto one's property is in the same category. It is a physical tort, and, except to the extent any tort is disturbing, has no component of disrupting an individual's repose.

 The Court of Appeals concluded that the term "invasion of rights of privacy" is ambiguous, and construed it against Allstate in finding that the term provided coverage for Dana. We agree that the term is shadowy, but for ambiguity to confer coverage, the covered item must be somewhere within the circle of ambiguity. Here, even the outermost reaches of the term's penumbra do not embrace a chemical transgression of the sort giving rise to Dana's environmental liability.

Because the terms "wrongful eviction" and "invasion of rights of privacy" do not support Dana's claim for coverage, we re-

verse the trial court's grant of Dana's motion for partial summary judgment as to coverage for personal injury liability under those terms.

### C. *Wrongful Entry*

"Wrongful entry" is among the "personal injuries" covered in the 1980 and 1981 policies. The trial court ruled that this term afforded Dana "personal injury" coverage under those policies. Allstate has not challenged that ruling, and we express no opinion as to it.

### III. Coverage for "All Sums Caused by an Occurrence"

 The policies provide that Allstate will pay "all sums which [Dana] shall be obligated to pay by reason of the liability ... imposed upon [Dana] by law ... for damages because of [personal injury or property damage] ... caused by an OCCURRENCE...." The definition of "occurrence," in determining coverage for liability from personal injury or property damage, is "an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury [or] Property Damage ... neither expected nor intended from the standpoint of the Insured."

These policies require Allstate to indemnify Dana for all sums paid as a result of liability arising from any covered accident or event resulting in property damage or personal injury that occurs during the policy period. Allstate contends it is responsible only for the portion of damages incurred in a particular policy period. It argues for a proportional allocation of damages among each triggered policy period. In the case of evolving damages, an "occurrence" as that term was used in the CGL policies of this era may take place over time. *Cf. Eli Lilly & Co. v. Home*

*Ins. Co.*, 653 F.Supp. 1, 10 (D.D.C.1984). If so, the "other insurance" clauses typically found in these policies may have the effect of prorating the damages among the insurers on the risk at different times in that period. *Cf. Ind. Ins. Co. v. Am. Underwriters, Inc.*, 261 Ind. 401, 407–08, 304 N.E.2d 783, 787 (1973).

However, there is no language in the coverage grant, including the definitions of "property damage," "personal injury," or "occurrence," that limits Allstate's responsibility to indemnification for liability derived solely for that portion of damages taking place within the policy period. By the policy's terms, once an accident or event resulting in Dana's liability—an occurrence—takes place within the policy period, Allstate must indemnify Dana for "all sums" Dana must pay as a result of that occurrence, subject to the policy limits. We agree with the Court of Appeals that whether or not the damaging effects of an occurrence continue beyond the end of the policy period, if coverage is triggered by an occurrence, it is triggered for "all sums" related to that occurrence.

We reverse the trial court and direct entry of partial summary judgment on this issue for Dana.

### IV. Exhaustion of Aggregate Limits of Primary Policies

Dana's primary liability insurer in the relevant years was The Hartford Insurance Group. Dana contends that the Hartford policies had property damage liability limits of $1 million per occurrence and also an aggregate $1 million limit. If so, once the total of $1 million in coverage for the policy year was exhausted, Allstate, as the excess insurer, was responsible for the balance. Allstate argues that the Hartford policies had no aggregate limits, and contained only per occurrence limits of $1 million for property damage liability. Under Allstate's view, Allstate's liability as

an excess carrier was triggered only if Dana incurred more than $1 million on a single occurrence. All agree that the contamination at each Dana location constitutes a separate occurrence.

■■■ The trial court found no aggregate limits in the Hartford policy, and the Court of Appeals agreed. 737 N.E.2d at 1196. The source of contention is the section "Limits of Liability" in the Hartford policies. That section states:

> The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the schedule as applicable to "each occurrence."

> Subject to the above provision respecting "each occurrence", the total liability of the company for all damages because of all property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of property damage liability stated in the schedule as "aggregate":

>> (1) all property damage arising out of premises or operations rated on a remuneration basis....

Allstate contends that, for the aggregate limit to apply, the property damage liability must have been rated on a "remuneration basis." Allstate further contends that the policies were rated on the basis of "sales," not "remuneration," and therefore there are no aggregate limits. Dana argues that the policies are ambiguous as to how the various risks were rated, and extrinsic evidence renders summary judgment inappropriate. Although Hartford was among the insurers who settled their disputes with Dana, it requested and received leave to intervene in this appeal

because, it contends, the presence of aggregate limits in policies of this type is an important and recurring issue.

The declaration pages in the Hartford policies state that the policies are "composite rated." The policies do not state what that term means. The Court of Appeals concluded that the composite rate "is a figure that combines the advance premiums for bodily injury coverages and property damage coverages and does not describe how those advance premiums were calculated." *Id.* n. 17. In deciding that the property damage liability was not remuneration rated, the Court of Appeals stated:

> If the policies had used a remuneration basis to calculate premiums, as Dana asserts, then the premiums listed on the coverage pages of the policies would have been calculated according to the rates set forth in the "Remuneration" premium basis category. Instead, the advance premiums were calculated according to rates that were set forth in the "Sales" basis category and used Dana's estimated sales to arrive at the premium amount.

*Id.* at 1196. We agree that the premium charged for the policy was apparently based on Dana's estimated sales. The form shows columns for calculating premiums for "bodily injury" and "property damage." The entire premium is shown in the bodily injury column. The column for the advance premium on property damage liability coverage states only, "INCL IN COMPOSITE RATE." The printed form allows for two types of coverage—"bodily injury" and "property damage"—and describes four "Rating Classifications," one of which is "Premises—Operations," which has as its "Premium Bases" "area," "front-

age," "remuneration," and "receipts." "Sales" appears only as a basis for premiums on "completed operations" and "products," both of which are excluded coverages under the policy.[6]

We cannot discern from this record how Dana's property damage liability was rated, or even whether it was rated at all, though we suppose it was. The Court of Appeals and the trial court equate "rated on remuneration" with calculation of the premium. This is certainly one common understanding of what it means to "rate" a risk. In the context of this policy, however, we think an equally plausible reading is that the reference to "remuneration" rating in the quoted subsection (1) of the printed form refers to coverages that are identified as rated by remuneration on the printed portion of the declaration. "Property Damage" is one of those, and under this reading would be subject to an aggregate limit. The second view is consistent with extrinsic evidence Dana designated in opposition to summary judgment regarding the understanding of Hartford employees and Dana's insurance broker as to how the Hartford policies rated Dana's property damage liability coverage.

█ Evidence of industry practice is admissible to construe terms of art or ambiguous agreements. *See* 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 22:49 (3d ed.1995); *cf. Abbey Villas Dev. Corp. v. Site Contractors, Inc.,* 716 N.E.2d 91, 100 (Ind.Ct.App.1999). In oversimplified terms, Dana offered evidence from Hartford and Dana employees and Dana's broker that the reference to "premises and operations rated on a remuneration basis" was understood in the industry to mean the premises and opera-

---

**6.** Beneath the words "Composite Rated" and "General Liability" are the words "Excluding Products/CO."

tions exposure of a manufacturing operation like Dana. All of these witnesses agreed that the policy was understood to include aggregate limits. The trial court found no ambiguity in the contract and disregarded this evidence. Because of the facial ambiguities we have described, we think Dana's evidence created a genuine issue of material fact as to the construction of this document and summary judgment was improperly granted on this issue.

■ As a final note on the aggregate limits issue, Hartford complains that Allstate, as a stranger to the policy, has no business disputing the understanding of the parties and their broker as to the meaning of the document. We disagree. Allstate, as an excess carrier, is entitled to rely on the underlying policies in evaluating its risks. But, similarly, Allstate is charged with an understanding of common industry practice. *Cf. Martin Rispens & Son v. Hall Farms, Inc.,* 601 N.E.2d 429, 438 (Ind.Ct.App.1992), *aff'd in part, rev'd in part on other grounds,* 621 N.E.2d 1078 (Ind.1993) ("[K]nowledge of trade usage must be imputed to those individuals who undertake business transactions in the industry, be they industry giants or newcomers."). How this all shakes out is a matter for the trier of fact in the first instance. We reverse the trial court's award of partial summary judgment to Allstate on this issue.

## V. "Triggered" Policies at Old Forge

Allstate contends the trial court erred when it found that only the 1978 policy was triggered by contamination at the Old Forge site. In Allstate's view, the 1979 policy was also triggered because Dana's contaminants continued causing damage at the site beyond the 1978 policy period. Dana argues that only the 1978 policy was triggered because the contamination at

Old Forge constituted a single occurrence. On the surface, the parties' respective positions may seem counterintuitive. The insurer is arguing that more than one policy applies and the insured contends only one policy was triggered. However, Allstate is an excess carrier whose liability is triggered only after exhaustion of underlying limits. If Allstate can spread Dana's Old Forge liabilities out over more than one policy year it can take advantage of the full amount of the underlying coverage—from its point of view a deductible—in multiple years.

■ For the reasons given in Part III, once a covered occurrence takes place, Allstate is obligated to indemnify Dana for all sums related to that occurrence up to the policy limits. However, as the Court of Appeals correctly noted, "the policies do not preclude continuing exposure to conditions from being an occurrence for the purposes of more than one policy period." 737 N.E.2d at 1203. *Cf. Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 471 (Ind. 1985) (coverage triggered at any point between ingestion of DES and the manifestation of DES-related disease). If contamination caused a covered occurrence in the 1978 policy period, and continued causing damage in the 1979 policy period, that contamination would trigger both policies.

■ The undisputed evidence is that contamination at the Old Forge site resulted from the dumping of hazardous wastes into a strip mine pit from August through December 1978. Complaints about the site began in early 1979, and "investigations revealed that most of the drums that were buried in the pits had broken open and that toxic chemicals had been released into the soil." 737 N.E.2d at 1199. Allstate's expert testified in a deposition that the contamination continued causing damage into the 1980s. *Id.* at 1201. Assuming this is correct, as the Court of Appeals

held, it is sufficient to trigger more than one policy. Allstate's designated evidence thus created a genuine issue of material fact precluding summary judgment in favor of Dana. We reverse the trial court's grant of summary judgment on this issue. We agree with Dana, however, that Dana may elect to seek indemnity from any or all of the policies at risk as to any single occurrence.

## VI. Exhaustion of Underlying Limits for Old Forge Claim

The parties disagree as to when Allstate's excess coverage attaches for liabilities incurred at the Old Forge site. Both parties argue this issue in the framework of the trial court's and Court of Appeals' holdings that Allstate's 1978 and 1979 policies provided personal injury coverage and that there is no aggregate limit on Hartford's property damage coverage. However, we concluded in Part II that no excess personal injury coverage applied, and in Part IV that the aggregate limit issue is not ripe for summary judgment. Our analysis stands on the shoulders of those holdings.

■■■ Allstate contends that Dana must exhaust the underlying Hartford limits for both property damage and personal injury before making a claim for excess coverage. Allstate bases this conclusion on three premises, only the third of which we find persuasive. First, Allstate contends that both coverages must be exhausted because the 1978 and 1979 Allstate policies[7] use the plural "limits," instead of the singular "limit" when referring to the exhaustion of underlying insurance.[8] We disagree with this contention because, even if Allstate were correct as to the intended effect of the word "limits," its use in this manner is, at least, ambiguous. It is common for major enterprises such as Dana to have layers of coverage stacked to provide insurance against risks at escalated levels. Here there is only one underlying CGL policy, Hartford's, but the excess form employed by Allstate presumably is used for higher level policies which insure above other excess carriers as well as the primary insurer. Indeed, a number of policies are listed in Allstate's schedule of "underlying policies," each with limits of its own for the various coverages other than general liability (advertising, workers compensation, etc.). The "limits of the underlying insurances" can readily be taken to mean that Allstate is not responsible

---

7. There is no contention by either party that the 1980 or 1981 Allstate policy is in dispute as to the Old Forge site.

8. The 1978 and 1979 policies state:
 II. LIMIT OF LIABILITY
 The Company shall only be liable for the Ultimate Net Loss in excess of either
 A. the limits of the underlying insurances as set out in the attached SCHEDULE OF UNDERLYING POLICIES in respect of each Occurrence covered by said underlying insurances....
 Endorsement No. 8 in the 1978 policy, as well as Endorsement No. 6 in the 1979 policy, states:
 In consideration of the premium charged, it is agreed that this policy is amended as indicated:

In the event of reduction or exhaustion of the aggregate limit or limits designated in the underlying policy or policies solely by payment of losses in respect to accidents or occurrences during the period of such underlying policy or policies, it is hereby understood and agreed that such insurance as is afforded by this policy shall apply in excess of the reduced underlying limit or, if such limit is exhausted, shall apply as underlying insurance, notwithstanding anything to the contrary in the terms and conditions of this policy, but this Endorsement shall only apply to underlying policies listed in the original schedule of underlying policies of this contract.

for coverage until the limits of all the listed underlying policies covering a particular claim have been exhausted, but not to imply that more than one limit in the same policy must be exhausted by the same occurrence. Moreover, one provision of the policy (Endorsement 8) provides that a reduction in the "limit or limits" of the "underlying policy or policies" causes the excess policy to drop down. This seems to assume that a given coverage has only one limit, and multiple underlying policies produce multiple applicable limits.

Allstate also bases its conclusion on this Court's statement in *Ryder Truck Lines, Inc. v. Carolina Cas. Ins. Co.*, 270 Ind. 315, 319, 385 N.E.2d 449, 452 (1979), that "the liability of the insurer under an excess insurance clause arises only after the limits of the primary policy are exhausted." This is, of course, generally a correct statement. However, we think *Ryder* means only that Dana must exhaust the underlying coverage applicable to the losses supporting its excess coverage claim, and does not resolve the issues presented here.

■ Finally, Allstate contends that both coverages must be exhausted because the parties have stipulated that Dana's liabilities at other sites are "properly described as both personal injury and property damage losses."[9] The trial court took the parties' stipulation to mean the underlying coverages for personal injury and property damage were both available to Dana when Dana sought indemnification for the cleanup costs incurred at those sites. The trial court then concluded that Dana's costs for other environmental liabilities could be allocated to either coverage for the purpose of determining whether an underlying limit was exhausted. Although this reasoning could have led the trial court to allocate the underlying payment to property damage, the trial court allocated Dana's losses at other sites to the bodily injury coverage of the Hartford policies, exhausting that coverage's underlying aggregate limit. In the trial court's view, this resolution mooted the question of whether Hartford's limit for property damage is aggregate or per occurrence because the trial court held exhaustion of either coverage sufficient to reach the excess policy.

The Court of Appeals disagreed, ruling that "Allstate's obligation does not attach until the Hartford policy limits for both personal injury and property damage have been reached." 737 N.E.2d at 1205. The issue turns on what underlying coverage is available to Dana under the Hartford policy, and whether Dana has incurred covered losses in excess of the applicable limit or limits of that coverage. Although it is not uncommon to have both personal injury and property damage coverage for the same occurrence, we think it unusual that two coverages apply to the same liability, as the parties stipulated is the case here.

9. The trial court described the parties' stipulation as follows:

> 3. At the hearing in chambers, counsel for [Allstate] further stipulated that ... Dana incurred Ultimate Net Loss in excess of $1 million for Occurrences other than [the] Old Forge landfill claim in both of the $^{78}/_{79}$ and $^{79}/_{80}$ policy years.... Counsel for [Allstate] further stipulated—without waiving [Allstate's] right to appeal the finding of the applicability of personal injury coverage to environmental losses and without waiv-

ing the assertion [Allstate] made in briefing that Dana had to exhaust both the personal injury aggregate limit and the property damage per occurrence limit for any claim against the [Allstate] policy—that [Dana's other environmental cleanup costs] are properly described as both personal injury and property damage losses.

Though the trial court describes this as a stipulation by Allstate, Dana, in its briefs, tells us that both parties agreed to it.

We are not faced with a single event, such as an explosion, that may harm both people and property and trigger both personal injury and property damage coverage for different injuries. Rather, the parties have stipulated, correctly or otherwise, that the same environmental cleanup liability falls under both underlying coverages. Given that unusual situation, we agree with the Court of Appeals that both underlying limits must be exhausted. This turns on the stipulated applicability of both coverages to all liabilities and would not typically be the case where different liabilities are incurred as a result of the same occurrence.

The remaining question is at what point the underlying policies are exhausted. This issue turns on the resolution of the aggregate limits issue described in Part IV. If there is an aggregate limit on Hartford's property damage coverage, it is separate from the personal injury aggregate limit and, therefore, Dana must incur $2 million in environmental liabilities for occurrences during the policy period before liability for both $1 million in property damage and $1 million in personal injury are incurred and Allstate's coverage attaches.[10] If there is a per occurrence limit on Hartford's property damage coverage, then Dana must have incurred $1 million in liability at the Old Forge site alone, in addition to another $1 million in liability at all sites for occurrences during the policy period, before Allstate's coverage attaches.

In sum, we hold that, because Dana and Allstate have stipulated that Dana's environmental liabilities are insured under both the property damage and the bodily injury coverage of Hartford's policy, Dana must exhaust both underlying coverages before seeking excess coverage from Allstate. Because the point at which Allstate's coverage attaches ultimately turns on whether Hartford's underlying limit is an aggregate or per occurrence limit, *see* Part IV, the trial court's summary judgment as to Allstate's coverage obligation for the Old Forge site is reversed.

### Mootness

After this appeal had been briefed and this opinion substantially completed, the parties advised this Court that they had settled and requested that the appeal be dismissed. However, because we disagree with the Court of Appeals' resolution of some issues that we believe likely to recur, we concluded to publish this opinion in the interest of guiding similarly situated parties in the future. *Cf. In re Lawrance,* 579 N.E.2d 32, 37 (Ind.1991).

### Conclusion

We affirm in part, reverse in part, and remand to the trial court to enter such orders of dismissal as may be warranted by the settlement agreement, or to take other action consistent with this opinion. As to all other issues, the Court of Appeals is summarily affirmed. Ind. Appellate Rule 58(A)(2).

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ. concur.

RUCKER, J., concurs except as to Part II–B, as to which he concurs in result.

10. A determination of whether Hartford's settlement was actually paid as bodily injury or property damage coverage, or both, is unnecessary. Allstate's coverage attaches as soon as liabilities are incurred in the amount of the underlying Hartford limits for the applicable coverages. Whether Dana's settlement with Hartford actually exhausted the underlying limits is also irrelevant; if it did not, then Dana is self-insured up to the applicable limits.