**Faith SADLER, Appellant–Plaintiff,**

v.

**AUTO–OWNERS INSURANCE COMPANY, Appellee–Defendant.**

No. 70A01–0804–CV–188.

Court of Appeals of Indiana.

April 15, 2009.

Mary F. Schmid, Indianapolis, IN, Attorney for Appellant.

David L. Taylor, Thomas R. Haley III, Jeffrey W. Ferrand, Carmel, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Senior Judge.

Faith Sadler ("Sadler") appeals from the granting of summary judgment in favor of defendant Auto–Owners Insurance Co. ("Auto–Owners") upon Sadler's complaint for Declaratory Judgment and for damages. Sadler's complaint asserted that Auto–Owners was obligated under property and casualty insurance policies to indemnify Sadler for costs and expenses of an environmental clean-up. The costs and expenses were occasioned by leakage from underground petroleum storage tanks. Sadler has also claimed that Auto–Owners breached its duty of good faith and fair dealing and sought compensatory and punitive damages plus attorney fees.

Sadler and her now deceased husband operated a gasoline service station on the property from 1975 to 1999 when the storage tanks were removed. Since that time, until 2004, Sadler operated a tobacco retail shop on the property. (App. at 50–55).

Auto–Owners filed its Motion for Summary Judgment (App. at 12). In its supporting memorandum, Auto–Owners alleged that Sadler has suffered no adverse financial effects of the clean-up costs because such costs and expenses were being fully borne by two other insurance companies, Farm Bureau Insurance Co. ("Farm Bureau") and American Economy Insurance Co. ("American Economy"), Auto–Owners asserts that this circumstance re-

flects an election of remedies by Sadler barring her claim against Auto–Owners. Auto–Owners also claimed that the underground contamination occurred after the policy or policies from Auto–Owners had expired [1] and that therefore, in any event, there was no coverage for the underground contamination. (App. at 21).

Sadler states that in 2000 a contractor hired to remove the underground storage tanks discovered contaminated soils. The Indiana Department of Environmental Management (IDEM) ordered an investigation of the extent of contamination and that Sadler must remediate the property. Discussions ensued during 2004 and 2005 between Sadler and the three insurance companies concerning participation by the various insurers with respect to investigative and testing costs. Those discussions also dealt, in a general manner, with the remediation clean-up costs. It appears that the insurers contemplated pro-rata payment of some or all of the costs involved with the soil contamination problem. During these discussions, Auto–Owners had discussed payment of between 9 percent and 22 percent of the costs (App. at 371) but did not commit to any particular percentage and stated that it would not "unqualifiedly indemnify." (App. at 372). Finally, in a letter dated June 9, 2005, Auto–Owners advised that although it would pay for "site investigation and site characterization done to date," Sadler's claim for indemnification "is denied." (App. at 373).

Because Sadler did not want to lose a prospective sale of the property, she en-

---

1. Auto–Owners claims that its commercial general liability coverage provided coverage only from 1985 to 1988. Sadler concedes that at various times from 1975 to 1999, other commercial general liability coverage was provided by Farm Bureau and American Economy, later known as SAFECO Property and Casualty Insurance Co. (App Br. at 5). Apparently, the Farm Bureau coverage extended from March 1988 to November 1993 and the American Economy policy covered November 1995 through November 1997. (App. at 8).

tered into a Site Release and Settlement Agreement with Farm Bureau and American Economy under which Farm Bureau and American Economy agreed to pay the remediation costs proscribed by the limits of their respective policies. All the parties to the Agreement reserved any rights or claims against Auto–Owners. This litigation ensued and in August 2006, Auto–Owners agreed to continue to provide a defense to Sadler with respect to Sadler's liability for remediation of the property but was doing so under a reservation of rights.

With regard to Sadler's claim of bad faith dealing, Auto–Owners maintains that there is no basis for such claim and certainly no evidence sufficient to carry the "clear and convincing" evidence standard for such a claim.[2] Following a hearing on March 20, 2008, the trial court, on March 25, 2008, entered its order granting summary judgment to Auto–Owners. In doing so, the court stated that there were no genuine issues of any material fact and that therefore Auto–Owners was entitled to judgment as a matter of law upon the entirety of Sadler's complaint (App. at 6).

## ELECTION OF REMEDIES

██ It is the position of Auto–Owners that the Settlement Agreement entered into between Sadler and Farm Bureau and American Economy provided that those two insurers would bear the full costs of the remediation and that accordingly Sadler was fully indemnified by those two insurers. In reaching that agreement and executing a release to Farm Bureau and American Economy, releasing the insurers from any claims by Sadler concerning the

environmental costs, Auto–Owners maintains that Sadler elected her remedy and restricted herself to payment of the clean-up costs by Farm Bureau and American Economy as a total settlement of any and all claims including any claims against Auto–Owners.

██ Sadler responds by asserting that the election of remedies doctrine was designed to "prevent excessive and repetitive litigation" (citing *Hoover v. Hearth & Home Design Center, Inc.*, 654 N.E.2d 744, 745 (Ind.1995)), and while designed to prevent double recovery by a claimant, the doctrine contemplates multiple remedies available to the claimant and does not prohibit pursuit of the same remedy against multiple parties. We note that to a certain degree Sadler's position is well taken. The election of remedies doctrine does not prohibit pleading and pursuing inconsistent theories of recovery at trial but does prohibit double recovery under alternative theories. *Cahoon v. Cummings*, 734 N.E.2d 535, 543 (Ind.2000). Stated somewhat differently, the *Cahoon* court held that the doctrine presupposes that the claimant has "two co-existing but *inconsistent* remedies." *Id.* at 542. If that party elects to pursue one remedy to a conclusion he may not thereafter "pursue a subsequent claim on a second *inconsistent* theory" *Id.* (Emphasis supplied).

Our first observation in this regard is that the claim against Auto–Owners is not inconsistent with Sadler's claims against Farm Bureau and American Economy. A claim against Auto–Owners upon its insurance policy issued to Sadler is not inconsistent with claims against Farm Bureau and

---

**2.** In *Erie Insurance Co. v. Hickman*, 622 N.E.2d 515 (Ind.1993), our Supreme Court noted that the standard for awarding punitive damages was proof by clear and convincing evidence. In *Freidline v. Shelby Insurance* Co., 774 N.E.2d 37 (Ind.2002), the court broadened that evidentiary burden to include not only a claim for punitive damages but the basic claim of a breach of the duty to act in good faith.

American Economy upon policies issued by those insurers.

Furthermore, we would note that Auto–Owners misconstrues the effect of the Settlement Agreement and Release. The Settlement Discharge and Release specifically stated that Sadler "expressly reserves all rights and claims against Auto–Owners and specifically states that this release shall not inure to the benefit of Auto–Owners." (App. at 95). Farm Bureau and American Economy also specifically reserved all rights and claims against Auto–Owners and stated that their release of Sadler "shall not inure to the benefit of Auto–Owners." (App. at 95).

It should be observed that the usual phrasing of the election of remedies doctrine and a consideration of the general doctrine does not address whether a claimant may pursue a theory of recovery against one defendant to a conclusion and thereafter assert the same theory of recovery against a different defendant. A collateral question concerns whether the election of remedies doctrine applies only in such instance when the first theory of recovery is concluded following litigation or whether it also applies to an amicable settlement of the claim without litigation between the initial parties.

With respect to the facts of the case before us, Sadler relies heavily upon *Allstate Insurance Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind.2001). In that case, as here, Dana Corporation had multiple insurers and made claims against them for indemnity for environmental contamination clean-up costs. After litigation and an initial appeal, Dana settled with all insurers except Allstate. Following further litigation a judgment for Dana against Allstate

was appealed. An election of remedies issue was not presented or discussed by the Indiana Court of Appeals. See *Allstate Insurance Co. v. Dana Corp.*, 737 N.E.2d 1177 (Ind.Ct.App.2000). However, upon transfer our Supreme Court's opinion clearly, if not explicitly, permitted the litigation against Allstate notwithstanding Dana's settlement arrangement with all the other insurers. Accordingly, we can only deduce that the election of remedies doctrine does not preclude separate claims against multiple insurance company defendants involving coverage liability for environmental clean-up costs.

The *Dana* case also tells us that a settlement of a claim rather than litigation to conclusion does not prohibit a subsequent claim against another insurer. This, however, does not end our inquiry because Auto–Owners contends that to permit the litigation to continue upon its possible insurance coverage liability is to permit Sadler to obtain recovery in excess of her liability for the clean-up costs. This circumstance is seen as a violation of the purpose of the election of remedies doctrine to prohibit double recovery. This appellate position rests upon the contention that Sadler "has been fully compensated and will continue to be fully compensated by operation of [the] Settlement Agreement [with Farm Bureau and American Economy, now SAFECO.]" (Appellee's Brief at 16–17). This contention, in turn, rests upon the portion of the Settlement Agreement which acknowledged that all remediation costs to date had been paid and the provision that the insurers would pay 100% of future reimbursable costs incurred by Sadler.[3]

---

**3.** The Agreement specified that the costs would be allocated with 73 percent to be borne by Farm Bureau and 27 percent by American Economy. To be sure, Sadler "is

not entitled to a windfall because [she] was insured by [multiple] insurance companies." *Liberty Mutual Insurance Co. v. OSI Industries*, 831 N.E.2d 192, 206 (Ind.Ct.App.2005),

Sadler counters, somewhat creatively, that because she "is not directly paying the remedial and defense costs ... no money is flowing from the other insurers into Sadler's pocket, nor would any proceeds paid by Auto–Owners if it would provide coverage." (Appellant's Reply Brief at 11). This posture implies that because Farm Bureau and American Economy are paying the remediation costs directly to the environmental firm and that that firm had not billed nor would, in the future, bill Sadler for any remediation costs, she is not precluded from seeking indemnity from Auto–Owners. This seems to address Auto–Owners' double recovery argument, but it does not bear upon whether Sadler has an independent claim against Auto–Owners. That Farm Bureau and American Economy, instead of Sadler, were paying all of the remediation costs directly to the environmental firm does not deprive Sadler of her claim. Despite the circumstances, those remediation costs were *incurred* by Sadler. *Scott v. Irmeger,* 859 N.E.2d 1238 (Ind.Ct.App.2007). It may well be that Farm Bureau and/or American Economy have a claim for equitable contribution from Auto–Owners. See 44A Am Jur.2d *Insurance* § 1765 (2003). However, it is problematical that their claim or claims may be asserted by Sadler. *Id.* Such a concept might be viewed as a contention that Sadler lacks standing to bring her claim against Auto–Owners. But the parties do not place their respective arguments in this posture. Therefore, we choose not to do so.

■ Rather, the parties discuss the matter in terms of real party in interest. Auto–Owners takes the position that only

Farm Bureau and American Economy or SAFECO reserved subrogation rights as against Auto–Owners and that such subrogation rights do not inure to Sadler's benefit because she did not receive an assignment of those subrogation rights.[4] Sadler counters, very simply, that whatever may be the arrangement between Sadler and the other two insurers, such does not affect her right to have a declaration as to Sadler's insurance coverage claim against Auto–Owners upon its policy with her.

The difference between standing and a real party in interest assertion is found in *Hammes v. Brumley,* 659 N.E.2d 1021 (Ind.1995). In that case, our Supreme Court noted that although the two concepts are related "they are indeed different concepts." The court noted that the real party in interest "is the person who is the true owner of the right sought to be enforced." *Id.;* See *Inlow v. Henderson, Daily, Withrow & DeVoe,* 787 N.E.2d 385, 395–96 (Ind.Ct.App.2003), *transfer denied.*

In the case before us, we hold that Sadler is truly the owner of her claim against Auto–Owners for coverage under the insurance policy or policies issued to her. Accordingly, she is the real party in interest on the claim being appealed. Therefore, summary judgment was improperly premised upon a real party in interest assertion. In summation as to the issue of whether Sadler had a viable claim against Auto–Owners, under the facts of this case, we hold that the trial court inappropriately entered summary judgment for Auto–Owners on the election of remedies theory.

---

*trans. denied.* This proposition is related to the concept that double recovery is precluded. As earlier noted, however, such does not prevent assertion of the same claim against multiple parties.

4. It should be noted that equitable contribution is distinct and independent from a right of subrogation. 44A, Am. Jur 2d. *Insurance* § 1766 (2003).

## SOIL CONTAMINATION OUTSIDE POLICY COVERAGE PERIOD

■ Auto–Owners claims that there is no evidence to reflect that the soil contamination took place during the period of Auto–Owner's insurance coverage. However, we note that counsel for Auto–Owners at the summary judgment hearing on March 30, 2008 clearly abandoned any such argument. He said:

We're not arguing that there's no question of any . . . of material fact that there was not a release [of underground contaminants] during the Auto–Owners' policy period. That, that's an issue for trial. They've got an expert that says one thing; we've got an expert that says another. That's a classic, you know, trial material.

(Tr. at 53–54).

In any event, with respect to the evidence, we believe the accurate way to state the situation is that the designated evidence on this matter permits conflicting inferences. Robert A. Hayes, an expert retained by Auto–Owners rendered a report with respect to the underground soil contamination. James E. Madding, an expert on behalf of Sadler, gave a deposition with respect to the same subject. The purpose of the views of these two experts was an attempt to pinpoint the contamination as to time. Sadler was desirous of fixing the time of contamination within the period of Auto–Owners policy coverage. On the other hand, Auto–Owners sought to use Mr. Hayes' opinion to negate the contamination as within that policy period, or at very least to disclose that it was impossible to fix a conclusive time of the underground release.

Mr. Madding's deposition testimony opined that when contamination was found in 2005 it resulted from releases "at the Sadler site." (App. at 304). This opinion however, did not pinpoint any time that such releases took place. He did venture the opinion that the only definitive way Auto–Owners could establish that contamination did not take place during the period of policy coverage would be to "provide tank and product line tightness test results for this time period" (App. at 302).

We would note that Mr. Sadler had apparently told the contractor who removed the storage tanks that tank tightness testing was done in the 1990s but that the records of such were destroyed in a 1994 fire at the Sadler location.[5] Mr. Sadler, however, did not reveal the results of the testing nor did he indicate that there had been evidence of leakage. (App. at 264). When the tanks were removed in 2000, they had been emptied for some time and the product lines and fuel pumps had been removed.

Mr. Hayes, in his report, stated that there was some evidence of contamination but that the data was insufficient to determine whether the source was "on site or off site." (App. at 81). More importantly, it was his opinion that the release of contaminants on the site would not have occurred more than fifteen years earlier and would not have occurred within the policy period but such release "is relatively recent or from an off-site location." (App. at 82).[6]

From this state of the record it can neither be determined that there was underground contamination which took place during the 1985–1988 policy period or that

---

5. Mr. Madding was unaware that tank tightness testing had purportedly been done in the early 1990s.

6. There was an indication in Mr. Madding's testimony that a degree of contamination had perhaps emanated from a nearby Shell service station. (App. at 303).

there was no such contamination which took place. Given this circumstance, this issue does not justify the summary judgment for Auto–Owners. We deem this not to be a matter directly bearing upon whether Sadler has a legitimate claim for bad faith.

## BAD FAITH CLAIM

■ In her brief, Sadler makes claims that Auto–Owners acted in bad faith with respect to her claim. These assertions of fact are unsupported by citations to the record as required by Indiana Rules of Appellate Procedure, Rule 22. Indiana Rules of Appellate Procedure, Rule 46 A. (8)(a).

Sadler baldly states that her bad faith claims are of merit because initially Auto–Owners said that it had no policy coverage but after finally confirming coverage sent inconsistent and ambiguous communications. Sadler asserts that Auto–Owners agreed to pay 22 percent of the claim but then changed that offer to 9 percent. She then concludes her entire argument with the fact that finally in June 2005, Auto–Owners denied, in full, Sadler's claim for remediation costs. Again, these assertions are unsupported by citation to the record.

Sadler's Reply Brief attempts to put more flesh on the bare-bones factual assertions. In essence, the argument is confined to the proposition that Auto–Owners' denial of liability to pay any costs of remediation is inconsistent with its earlier proposal to pay 22 percent, later reduced to 9 percent, and therefore reflects the bad faith of Auto–Owners. This position is not a fair representation of the facts as reflected in the record before us.

We would first note that when Auto–Owners first indicated that there was no coverage through any of its policies, such was premised upon the determination that a 1988–1989 policy was cancelled at its inception. Subsequently, however, the insurance company conducted a diligent search of "archaic microfiche records" (App. at 60) and discovered that Sadler was in fact covered from 1985 to 1988. It appears that Sadler's own representations as to the period of policy coverage accounts for some of the difficulty in ascertaining the actual period of coverage. In any event, we conclude that these facts do not give rise to any reasonable assertion of bad faith.

The principal thrust of Sadler's argument concerns the change in Auto–Owners' willingness to pay a certain percentage of costs as opposed to a total denial of coverage. Again, this is not an accurate reflection of what Auto–Owners had communicated to Sadler.

Auto–Owners did in fact, in November 2004, state that it agreed to reimburse "22% of the *environmental testing fees.*" (App. at 369). (Emphasis supplied). This could only be reasonably interpreted to agree to payment of a percentage of the initial investigation costs and to characterize the situation. It could not be reasonably construed to be an offer to pay costs of the actual remediation or any particular percentage of remediation costs.

On February 3, 2005, Auto–Owners did pay 22 percent of the cost of the Initial Site Characterization, but in that communication to Sadler stated that it was continuing to investigate the claimed loss under a reservation of rights. Auto–Owners explicitly stated that it was not agreeing to "a 22% share of the *cleanup* cost." (App. at 371). (Emphasis supplied). In the same letter, "in order to keep the loss (sic) moving forward," Auto–Owners made a settlement offer of 9 percent of the "proposed cleanup cost after [any payment from] [Indiana's Underground Storage Tank Excess Liability Trust Fund]." (App.

at 89; 371). This proposal was made in return for "a full release under our policy or a policy buyback agreement." (App. at 371).[7]

█ Additionally, we would allude to our discussion of the designated evidence as to whether the underground leakage took place during the policy coverage in question. As earlier noted, that evidence is susceptible to conflicting inferences. In order to prove a claim of bad faith, a plaintiff must establish an element of conscious wrongdoing. There must be "evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley v. Indiana Farmers Mutual Insurance Group,* 691 N.E.2d 1259, 1261 (Ind.Ct.App.1998), *trans. denied.* The evidence designated by Sadler falls far short of this requirement.

As noted in *Monroe Guaranty Insurance Co. v. Magwerks Corp.,* 829 N.E.2d 968 (Ind.2005) (citing *Erie Insurance Co. v. Hickman,* 622 N.E.2d 515 (Ind.1993)), it has long been the rule in Indiana that insurance companies may, in good faith, dispute claims. The record before us reflects that such is the case here. Accordingly, we hold that Sadler did not demonstrate a legitimate bad faith claim and that it was not inappropriate to grant Auto–Owners' motion for summary judgment as to this issue.

### CONCLUSION

The judgment for Auto–Owners upon Sadler's claim for bad faith and for punitive damages is affirmed. The judgment for Auto–Owners upon the environmental claims is reversed and the cause is re-manded for further proceedings upon those issues

NAJAM, J., and BROWN, J., concur.

---

7. It is well established that as a general rule evidence of offers of compromise and settlement are inadmissible. Indiana Rules of Evidence, Rule 408; *Hahn v. Ford Motor Co., Inc.,* 434 N.E.2d 943, 956 (Ind.Ct.App.1982).

Under the circumstances before us, we are of the view that this communication from Auto–Owners is excludable from an effort by Sadler to establish her claim of bad faith.