**FEDERATED RURAL ELECTRIC INSURANCE EXCHANGE, Appellant–Plaintiff,**

v.

**NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY, Appellee–Defendant.**

No. 49A05–0305–CV–227.

Court of Appeals of Indiana.

March 30, 2004.

Michael A. Wilkins, Brent W. Huber, Brian E. Bailey, Ice Miller, Indianapolis, IN, Attorneys for Appellant.

Laura S. Reed, Riley Bennett & Egloff, Indianapolis, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In 1992, Gregg and Susan Fischer sued Tipmont Rural Electric Membership Corporation ("REMC") alleging damages caused by stray voltage on their dairy farm. During the eleven-year period that damages occurred, REMC was insured first by National Farmers Union Property and Casualty Company ("NFU"), and thereafter by Federated Rural Electric Insurance Exchange ("Federated"). Federated and NFU's policies shared similar coverage provisions, but only Federated defended the Fischers' claim against REMC. Following two trials, the Fischers were awarded a judgment against REMC in December 1995, and Federated paid that judgment, which totaled $2,204,681.85, in October 1999.[1] But before Federated

---

1. On appeal, both this court and our supreme court affirmed the judgment against REMC.

paid the judgment, REMC executed an Indemnity Agreement in which it assigned to Federated any policy-based claims it had against NFU.

In March 2000, Federated filed a Complaint against NFU seeking to recover the entire amount of the judgment it paid on REMC's behalf, plus defense costs. Federated filed a motion for summary judgment, which the trial court denied. Federated now appeals, and NFU cross-appeals from the trial court's summary judgment order. We address the following issues for review:

1. Whether the trial court erred when it determined that neither party was entitled to summary judgment based on the "all sums" provisions in NFU and Federated's policies.
2. Whether Federated is entitled to summary judgment based on NFU's alleged repudiation of its policies.

We affirm.

## FACTS AND PROCEDURAL HISTORY

REMC supplied electricity to the Fischers' dairy farm. In 1992, the Fischers sued REMC alleging, among other things, that from approximately April 1980 through 1991, stray voltage had reduced the milk production of their dairy cows. From 1975 through May 1, 1985, NFU provided liability insurance coverage to REMC. Those policies covered REMC's liability for property damage, including liability for stray voltage. In addition, NFU's policies contained an "all sums" provision, which provides in relevant part:

The Company [NFU] *will pay on behalf of the Insured all sums which the Insured shall become legally obligated to*

See *Tipmont Rural Elec. Membership v. Fischer,* 697 N.E.2d 83 (Ind.Ct.App.1998), *aff'd,*

*pay as damages, including punitive damages because of personal injury or property damage to which this insurance applies, caused by an occurrence,* and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgement [sic] or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgements [sic] or settlement.

(Emphasis added). The policies define "occurrence" as follows:

The word "occurrence" means either an accident or happening during the policy period or a continuous or repeated exposure to conditions, neither expected nor intended from the standpoint of the Insured which causes ... injury to ... tangible property during the policy period. All injury or damage arising of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

NFU's policies also contained an "other insurance" clause, which provides in part:

P. Other Insurance: This insurance is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this

716 N.E.2d 357 (Ind.1999).

policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy, for a greater proportion of the loss than that stated in the applicable contribution provision below[.]

From May 1, 1985, through July 1991, Federated provided liability insurance coverage to REMC. Federated's policies provided general liability coverage for property damage, including liability for stray voltage. Federated's policies also contained an "all sums" provision, a definition of "occurrence," and an "other insurance" provision, all of which are similar to NFU's corresponding provisions.[2]

After the Fischers filed their complaint against REMC, Federated sent NFU a letter in November 1992 regarding the suit. Specifically, the letter confirmed that Federated had "coverage from May 1, 1985, to present" and requested that NFU confirm its coverage dates. Federated also informed NFU that "[d]efense of [the] matter [had] been assigned to Peter L. Obremskey, an attorney located in Lebanon, Indiana." NFU did not respond to Federated's letter.

In February 1994, Federated sent another letter to NFU, which provided in relevant part:

> Attached is a copy of a letter forwarded to your attention in late 1992, along with an additional copy of the Complaint served against our insured. Our file does not reflect any response from your end.
>
> In any event, this case has not made a great deal of progress to date. Our information is that your company had the coverage prior to our first policy, which issued May 1, 1985. I would appreciate your confirming this and getting back to me so we can coordinate future handling of the defense.

NFU did not respond to Federated's second letter.

---

2. The "all sums" provision in Federated's policies provides:

> Federated will pay on behalf of the policyholder *all sums, up to the Limit of Liability in the Declarations, which the policyholder shall become legally obligated to pay as damages because of personal injury, or property damage, to which this insurance applies, caused by an occurrence.* Federated shall have the right and duty to defend any suit against the policyholder to which this policy applies, even though the allegations of the suit may be groundless. Federated may investigate and settle any claims as it deems expedient.

Federated's policies define "occurrence" as:

> [A]n accident which takes place during the policy period, or that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury, property damage . . . neither expected nor intended by the insured.
>
> With respect to . . . property damage, all such exposures to substantially the same general conditions existing at or emanating from one location or source shall be deemed one occurrence.

The "other insurance" clause provides:

> Subsection 10. If there is available to the policyholder any other insurance or indemnity covering any loss covered by this Section, Federated shall be liable hereunder only for that part of such loss which is in excess of the amount recoverable or recovered from such other insurance or indemnity, provided except under Insuring Agreement A and E, the insurance under this Section shall not apply (a) to property which is separately described and enumerated and specifically insured in whole or in part by any other insurance; or (b) to property otherwise insured unless such property is owned by the policyholder. Federated waives any right or contribution which it may have against any forgery insurance carried by any depository bank which is indemnified under Insuring Agreement E.

In October 1994, Federated defended REMC in a trial that resulted in a hung jury. In July 1995, REMC's general counsel sent NFU a letter, which provided in part:

We are currently involved in stray voltage litigation and the claimant alleges damages from 1980 through 1991. Our records indicate that your company handled insurance coverage for Tipmont REMC for the years 1980 through 1985. Therefore, I would appreciate your extending coverage for this claim and immediately assisting with the defense.

Defense counsel is Pete Obremskey whose offices are in Lebanon, Indiana and his phone is 317–482–0110. The case is scheduled for trial October 24, 1995 and is scheduled for mediation August 18, 1995 in Terre Haute, Indiana.

Please contact Mr. Obremskey immediately to make necessary arrangements to assist in the defense of this claim.

NFU responded to REMC in August 1995 and confirmed coverage dates from December 1975 until May 1985. NFU also stated that it would "be in contact with Mr. Obremskey and Mr. Connor to make arrangements to participate in the defense of this matter."

REMC's second trial occurred in December 1995 and, despite NFU's stated intention to assist, only Federated defended REMC. A jury entered a verdict in favor of the Fischers and awarded them $1,683,800 in compensatory damages. In January 1996, Attorney Obremskey sent NFU a letter, which provided in part:

By now I am sure you have heard from John Connor the bad news concerning the above captioned case. After an eight week trial, the jury found in favor of the Plaintiffs [and] against Tipmont REMC and assessed the Plaintiffs[ ] damages in the amount of $1,683,800. I am enclosing a copy of the Judgment Entry herein.

We have made the decision to appeal the judgment of the trial court and I am enclosing herein the Praecipe of the Record which starts the appeal process here in Indiana. I will forward to you copies of briefs, etc. as they are filed. I would anticipate that it would take a significant amount of time to transcribe the record as it will consist of approximately 5,000 pages. If it is filed before the end of the year, I will be surprised. Then comes the briefing that will probably take the majority of 1997 so I doubt if we have a decision from the Court of Appeals much before 1998.

If you have any questions, please give me a call.

Federated paid a supersedeas bond, and proceeded with the appeal.

After this court affirmed the trial court's judgment, see *Tipmont*, 697 N.E.2d at 94, and while Federated's petition for transfer was pending, Federated sent NFU a letter in which Federated raised the issue of allocation of the judgment and costs as follows:

The plaintiffs have calculated the value of the judgment plus accrued interest at slightly over $2.1 million. They indicate that post-judgment interest is accruing at slightly over $11,000 per month. They indicate they would take $2 million even if we withdrew our petition for review [with the Indiana Supreme Court].

I do not recall if we ever agreed on an allocation in this case. I have not yet reviewed our file in its entirety. If you have some thoughts or record of this, please give me a call. You may recall that the plaintiff's economist calculated damages beginning in the early 1980s. The occurrence allegedly took place from 1980, when the plaintiff began op-

erating at this farm, until June, 1991, when an isolation device was installed at the transformer pole.

There is no designated evidence regarding NFU's response, if any, to that letter.

In September 1999, our supreme court affirmed the trial court's judgment. *See Tipmont,* 716 N.E.2d at 358. At the conclusion of the appeals, REMC owed the Fischers, including interest and costs, a total of $2,204,681.85.

On October 26, 1999, REMC executed an Indemnity Agreement, in which it assigned to Federated "all rights, title and interest in any contract of liability insurance applicable to the underlying claim, including, but not limited to Policy Number 12–80342–54–01, issued by [NFU]. . . ." In addition, REMC appointed [Federated] its "attorney-in-fact to receive any such money or proceeds in our name or otherwise, and to make demand and commence legal action . . . as it deems fit, to collect and all such money . . . in the name of [Federated] or [REMC]." On or before October 28, 1999, Federated paid the judgment of $2,204,681.85. Federated also paid all defense costs, which totaled $462,916.29.

Thereafter, in March 2000, Federated filed suit against NFU alleging claims for contribution, indemnity, and subrogation. While Federated's suit was pending, our supreme court issued its opinion in *Allstate Ins. Co. v. Dana Corp.,* 759 N.E.2d 1049 (Ind.2001) (*"Dana II"*),[3] which involved an excess liability policy that contained an "all sums" provision similar to that contained in NFU's policies. *See Discussion and Decision, infra.* In July 2002, following that decision, Federated

sent NFU a letter which provided in relevant part:

> As you know, pursuant to the Indemnity Agreement [executed by REMC] . . ., [REMC] assigned, transferred, pledged, and conveyed to Federated, all rights, title and interest of [REMC] in the NFU policies. *Federated therefore now exercises the right of [REMC] to elect NFU as the insurance carrier that will pay all sums of the liability for defense and indemnity arising out of the Fischer Action, pursuant to the All Sums rule affirmed by the Indiana Supreme Court in [Dana II].* NFU has waived any right, and is estopped, to assert any defenses or objections to its duty to defend and indemnify [REMC] with respect to the Fischer Action. All such sums are due and owing from NFU to Federated as the assignee of [REMC]. Federated therefore demands payment in full of the entire amount paid by Federated on behalf of [REMC] with respect to the Fischer Action, including without limitation the judgment, costs, interest on the judgment, and defense costs, within thirty (30) days from the date of this letter, in a total current amount of $2,667,598.

(Citation omitted, emphasis added). NFU did not comply with Federated's demand.

Federated then filed an amended complaint that added claims for bad faith, post-litigation bad faith, and asserted that NFU was estopped from relying on the language of its policy with REMC because it had abandoned REMC when it had a duty to defend. In February 2002, Federated moved for summary judgment. Although it did not file a formal cross-motion, NFU responded that it owed Federated nothing and that summary judgment

---

3. We refer to the Court of Appeals' decision, *Allstate Ins. Co. v. Dana Corp.,* 737 N.E.2d 1177 (Ind.Ct.App.2000), *aff'd in part, vacated in part,* as *"Dana I."* We refer to both opinions collectively as "the *Dana* litigation."

should be entered in its favor. In March 2003, the trial court entered its summary judgment order, which rejected the arguments of both parties and provided in relevant part:

2. Plaintiff's Complaint alleges that Plaintiff, [Federated], issued policies of insurance to [REMC] covering liability for stray voltage claims[,] which policies included primary liability and umbrella coverage from May 1, 1985 through June 1, 1991.

3. Plaintiff's Complaint further alleges that Defendant, [NFU], issued policies of insurance to [REMC] covering liability for stray voltage claims, which policies included primary liability and umbrella coverage from approximately May 1, 1975 through [May 1, 1985].

4. The insurance policy issued by [NFU] provides that it will pay all sums which [REMC] becomes legally obligated to pay as damages.

5. The applicable insurance policy issued by [Federated] also provides that it will pay all sums which [REMC] becomes legally obligated to pay as damages.

6. The insurance policies issued by both [Federated] and [NFU] each contain "other insurance" clauses.

7. Such policy provisions are for the purpose of reducing an insurer's liability when an insured has access to other insurance. *Indiana Ins. Co. v. American Underwriters, Inc.*, 261 Ind. 401, 304 N.E.2d 783, 787 (1973).

8. [Federated] relies upon *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind.2001), for the proposition that [NFU] must indemnify for the total amount of damages.

9. The Indiana Supreme Court in *Allstate Ins. Co. v. Dana Corp., supra,* discussed "other insurance" clauses in the context of prorating damages among insurers at different times.

10. The contention in that case was that the policy at issue required indemnity only for damages incurred in a particular policy period.

11. The parties in the case at bar do not dispute that both policies provide for indemnity during the period of the subject loss, and that they both cover the same risk.

12. Both [Federated] and [NFU] are liable for a prorated amount of the resultant damages and costs. *See Lititz Mut. Ins. Co. v. Lengacher,* 248 F.2d 850, 854 (7th Cir.1957); *Emmco Ins. Co. v. Indiana Farmers Mut. Ins. Co.,* 152 Ind.App. 212, 283 N.E.2d 404, 406 (1972).

13. By reason of the foregoing, [Federated] is not entitled to summary judgment, as requested.

This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing the grant or denial of summary judgment, we use the same standard used by the trial court. *Allstate Ins. Co. v. Smith,* 656 N.E.2d 1156, 1157 (Ind. Ct.App.1995). Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). In the context of cross-motions for summary judgment, the trial court must deal with each motion separately, construing the facts and inferences to be drawn therefrom in a light most favorable to the non-moving party.

*Allstate,* 656 N.E.2d at 1157. If the facts are undisputed, our task is to determine the law applicable to those facts, and whether the trial court correctly applied it. *Id.*[4]

### I. The *Dana* Litigation and the "All Sums" Provision

■ Both parties assert that the trial court misinterpreted our supreme court's decision in *Dana II* when it determined that both Federated and NFU owe a prorated share of the judgment against REMC. Specifically, Federated claims that under *Dana II,* REMC could elect NFU to indemnify it for "all sums" REMC had to pay to the Fischers. And because REMC had assigned its right to sue NFU to Federated before Federated paid the judgment, Federated, as the assignee, could elect NFU to pay all sums under the policy.[5] On the other hand, NFU argues that REMC elected Federated to pay all sums, and that REMC should not receive double recovery since Federated has already paid the judgment in full. But contrary to the parties' assertions, neither party is entitled to summary judgment under *Dana II.*

Our supreme court explained the background of the *Dana* litigation as follows:

Dana Corporation is a manufacturer of automotive components. Sixty-three of its facilities, located in nineteen states, have become the subject of governmental or third-party actions resulting in substantial environmental cleanup costs. Allstate Insurance Company is the successor in interest to Dana's excess liability insurer in the relevant years. When Dana's liability insurers denied coverage for the cleanup, Dana sued. Several trial court rulings produced an interlocutory appeal in 1997. [Pursuant to that appeal, this court determined that] Dana was entitled to indemnity for cleanup costs, subject to policy limits and exclusions.

After the first appeal, Dana settled with all of its insurers except Allstate. Although Dana's coverage of at least some cleanup costs was established, a number of issues remained unresolved. These were the subject of a second round of motions resulting in the trial court's entry of judgment for Dana in the amount of $4,599,314.30 as to Dana's facility in Old Forge, Pennsylvania, one of several sites. Although liability as to the other sites remained unadjudicated, the trial court certified the Old Forge judgment and a number of earlier rulings on partial summary judgments for appeal pursuant to Trial Rule 54(B). Both Allstate and Dana appealed. Each challenged three of the trial court's rulings and

---

**4.** Here, the trial court issued findings and conclusions in support of its order denying Federated's motion for summary judgment. Although we are not bound by those findings and conclusions, they aid our review by providing reasons for the trial court's decision. *Ebersol v. Mishler,* 775 N.E.2d 373, 378 (Ind. Ct.App.2002), *trans. denied.* Further, our review of the summary judgment hearing shows that the trial court disagreed with the parties that *Dana II* controls the outcome of this case. Rather, the trial court determined that because both NFU and Federated's policies contained "other insurance" clauses, those clauses require each party to pay a prorated share of the loss. Moreover, the parties acknowledged at that hearing that the court did

not have all relevant information before it to make an actual allocation of the loss.

**5.** For the first time in its Reply Brief, Federated asserts that REMC, in fact, "elected" NFU to pay all sums in July 1995 when REMC's general counsel asked NFU to assist in defending against the Fischers' suit. Federated did not make that argument to the trial court, and it cannot raise it for the first time in a reply brief. Thus, that argument is waived. *See Crossmann Communities, Inc. v. Dean,* 767 N.E.2d 1035, 1044 (Ind.Ct.App.2002) (issues raised for first time in reply brief are waived).

defended three others. The Court of Appeals addressed all six in detail, affirming two and reversing four.

*Dana II*, 759 N.E.2d at 1052 (citations omitted).

One of the primary disputes between Dana and Allstate was the interpretation of an "all sums" provision contained in Allstate's policies. In *Dana I*, Dana argued that the trial court should have granted its motion for partial summary judgment because Allstate was obligated to indemnify it for "all sums" of its liability for damages arising out an occurrence, subject to policy limits, and that Allstate's obligation to pay would be joint and several with that of any other insurer who had an obligation to pay under its policy. *Dana I*, 737 N.E.2d at 1188. Allstate responded in part that it was liable only for damage that occurred *during* the policy period. We explained that "[u]nder Allstate's . . . argument, all carriers that have a duty to indemnify an insured for damages would have those damages prorated among them." *Id.*

But before we analyzed the parties' substantive arguments, we stated:

> The resolution of this issue turns on what the policies provide. If the policies provide, as Allstate contends, that Allstate is liable to indemnify only for damage that occurs during a policy period, then that is the extent of Allstate's liability. If the policies provide, as Dana contends, that Allstate is liable for all damages once coverage is triggered by an occurrence without regard to whether the damages extended beyond a policy period, then that is the extent of Allstate's liability. *Under both circumstances, the existence of other coverage may affect the amounts payable either under policy terms or equitable principles.* Furthermore, under both circumstances, policy limits are applicable and policy provisions regarding the relationship between underlying primary insurance and the excess insurance provided by the policies are applicable.

*Id.* at 1189 (emphasis added).

We then looked to the language of Allstate's policy, which included an "all sums" provision that required Allstate to indemnify Dana "for all sums which [Dana] shall be obligated to pay by reason of the liability imposed upon [Dana] . . . because of . . . property damage . . . to which this policy applies, caused by an occurrence, happening anywhere in the world." *Id.* at 1190. The policy defined "occurrence" in relevant part as "an accident or event including continuous or repeated exposure to conditions which results, during the policy period, in . . . Property Damage. . . . All . . . Property Damage . . . caused by one event or by continuance or repeated exposure to substantially the same conditions shall be deemed to result from one Occurrence." *Id.* at 1191.[6] Based on that policy language, together with the absence of policy language that limited Allstate's obligation to indemnify Dana only for property damage incurred *during* the policy period, we held that "Allstate must indemnify Dana for all of the liability caused by the occurrence up to the limits of the triggered policy." *Id.* at 1192. Stated differently, we determined that Allstate's liability was not limited to damages that *occurred within a particular policy period.* Rather, once an "occurrence" triggered one of Allstate's policies, Allstate had to pay "all sums" up to the policy limits.

---

**6.** The definition of "occurrence" in both NFU and Federated's policies is nearly identical to the definition of "occurrence" in Allstate's policies. *See* Facts and Procedural History, *supra*.

This court also addressed a dispute between Dana and Allstate regarding whether one or multiple policies had been triggered by the continuing contamination at Dana's Old Forge site. Based on the definition of "occurrence" in Allstate's policies, we explained:

> What the policies require to trigger indemnification is an occurrence "during the policy period." Continuous or repeated exposure to conditions that results in property damage during a policy period is a single occurrence for the purposes of that policy. *If those conditions persist into the period covered by a subsequent policy, there is no language to preclude there being an occurrence for the purposes of the subsequent policy. Thus, ongoing exposure to conditions of pollution can constitute an occurrence for each consecutive policy*
> . . . .

*Id.* at 1201 (record citation omitted, emphasis added).

In *Dana II*, 759 N.E.2d at 1057–58, our supreme court granted transfer and affirmed this court's conclusion on the "all sums" issue as follows:

> These policies require Allstate to indemnify Dana for all sums paid as a result of liability arising from any covered accident or event resulting in property damage . . . that occurs during the policy period. Allstate contends it is responsible only for the portion of damages incurred in a particular policy period. It argues for a proportional allocation of damages among each triggered policy period. In the case of evolving damages, an "occurrence" as that term was used in the CGL [Comprehensive General Liability Policy] policies of this era

may take place over time. *Cf. Eli Lilly & Co. v. Home*, 653 F.Supp. 1, 10 (D.D.C.1984). If so, the "other insurance" clauses typically found in these policies may have the effect of prorating the damages among the insurers on the risk at different times in that period. *Cf. [Indiana Ins. Co. v. American Underwriters, Inc.*, 261 Ind. 401, 407–08, 304 N.E.2d 783, 787 (1973) ].

> However, there is no language in the coverage grant . . . that limits Allstate's responsibility to indemnification for liability derived solely for that portion of damages taking place within the policy period. By the policy's terms, *once an accident or event resulting in Dana's liability—an occurrence—takes place within the policy period, Allstate must indemnify Dana for "all sums" Dana must pay as a result of that occurrence, subject to the policy limits.* We agree with the Court of Appeals that whether or not the damaging effects of an occurrence continue beyond the end of the policy period, if coverage is triggered by an occurrence, it is triggered for "all sums" related to that occurrence.

*Id.* (emphasis added).

Our supreme court also addressed Allstate's assertion that more than one policy, namely the 1978 and 1979 policies, had been triggered by the contamination at Dana's Old Forge site. Dana disagreed and alleged that only the 1978 policy had been triggered.[7] In affirming this court's determination that the trial court had erroneously entered partial summary judgment in Dana's favor, our supreme court stated:

> For the reasons given in Part III [discussing the "all sums" provision], once a

---

**7.** As the court explained, because Allstate is an excess carrier whose liability is triggered only after exhaustion of underlying limits, it would benefit Allstate to spread Dana's liabilities out over more than one policy period so that it can take advantage of underlying coverage in multiple years. *Dana II*, 759 N.E.2d at 1060.

**466**

covered occurrence takes place, Allstate is obligated to indemnify Dana for all sums related to that occurrence up to the policy limits. *However, as the Court of Appeals correctly noted, "the policies do not preclude continuing exposure to conditions from being an occurrence for the purposes of more than one policy period." If contamination caused a covered occurrence in the 1978 policy period, and continued causing damage in the 1979 policy period, that contamination would trigger both policies.*

*Id.* at 1060 (citations omitted). After determining that summary judgment was improper on the issue of whether more than one policy period had been triggered, the court also stated, "We agree with Dana, however, that Dana may elect to seek indemnity from *any or all of the policies at risk as to any single occurrence.*" *Id.* (Emphasis added).

We agree with the trial court that *Dana I* and *Dana II* are not dispositive. *See* Footnote 5, *supra.* In the *Dana* litigation, Allstate, the successor in interest to Dana's excess liability insurer, sought to limit its liability to damages that occurred within each policy period and, specifically, wanted each insurer whose policies were triggered during the *same* policy period to pay a prorated share of damages. Accordingly, *Dana I* and *Dana II* did not address the primary dispute here, namely, how to allocate damages between two primary insurers whose policies covered the same risk *at different times and during different policy periods.*

In addition, as noted above, this court recognized in *DanaI* that despite our determination that Allstate was liable for "all sums" up to the policy limits, "the existence of other coverage may affect the amounts payable either under policy terms or equitable principles." 737 N.E.2d at 1189. Moreover, we advised that in addi-

tion to particular policy limits, "the relationship between underlying primary insurance and the excess insurance provided by the policies are applicable." *Id.* Therefore, contrary to what both parties have argued in this case, the determination in *Dana I*, which was affirmed in *Dana II*, that Allstate was liable for "all sums" up to policy limits under the language of its policies was not a final adjudication of the amount Allstate had to pay Dana. The parties err when they attempt to extract from *Dana I* and *Dana II* an "all sums" rule and apply it out of context.

Further, we reject the parties' assertion that under *Dana II*, REMC could elect either NFU or Federated to indemnify it for its loss. Again, both NFU and Federated's policies contain definitions of "occurrence" similar to the definition of "occurrence" discussed in the *Dana* litigation. *See* Facts and Procedural History, *supra.* Based on that definition, this court determined, and our supreme court agreed, that while "[c]ontinuous or repeated exposure to conditions that results in property damage during a policy period is a single occurrence for the purposes of that policy[,]" as long as those conditions persist, there is nothing in the policy language "to preclude there being an occurrence for the purposes of the subsequent policy." *Dana I*, 737 N.E.2d at 1201; *see Dana II*, 759 N.E.2d at 1060 ("However, as the Court of Appeals correctly noted, 'the policies do not preclude continuing exposure to conditions from being an occurrence for the purposes of more than one policy period.' "). Therefore, "ongoing exposure to conditions ... can constitute an occurrence for *each consecutive policy ....*" *Dana I*, 737 N.E.2d at 1201 (emphasis added).

■ Here, as in the *Dana* litigation, where environmental contamination took place over a period of years, the Fischers' dairy cows were exposed to stray voltage

over an eleven-year period. As we have explained, NFU's policies provided coverage to REMC from 1980 through May 1, 1985, and Federated's policies provided coverage from May 1, 1985 through July 1991. And again, as in the *Dana* litigation, nothing in NFU or Federated's policies preclude continuing exposure to conditions from being an occurrence for the purposes of more than one policy period.[8] Thus, based on the definitions of "occurrence" contained in both NFU and Federated's policies, the cows' ongoing exposure to stray voltage constitutes an occurrence for *each consecutive policy* in effect over those eleven years. Significantly, NFU and Federated did not *both* provide coverage for any occurrence during the same policy period. Therefore, although our supreme court stated that an insured "may elect to seek indemnity from any or all of the policies at risk as to any *single occurrence* [,]" *Dana II*, 759 N.E.2d at 1061, REMC had no election to make in this case.

In sum, we conclude that the parties' reliance on *Dana II* is misplaced. That decision did not establish an "all sums" rule to be applied in other contexts. Even though our supreme court agreed with Dana's interpretation of the "all sums" provision, this court recognized in *Dana I* that other coverage and equitable principles may affect the ultimate amount payable in that case. Further, the discussion of the "all sums" provision in *Dana I* and *Dana II* concerned whether Allstate's duty to pay damages would be confined to those damages that occurred within a particular policy period, which would allow for Allstate and any other insurers that provided coverage for the same policy period to prorate damages for that period. Here, NFU and Federated did not provide coverage for the same policy period. And even though the policies at issue contain similar "all sums" provisions, we disagree with the parties' contention that REMC could elect either NFU or Federated to pay "all sums." Again, because ongoing exposure to the stray voltage can constitute an occurrence for each consecutive policy period, REMC had no election to make. Rather, the stray voltage which continued to cause property damage over eleven years triggered both policies at different times. Therefore, neither Federated nor NFU is entitled to summary judgment under *Dana II*.[9]

---

8. NFU alleges that "Federated has ... admitted that there was one occurrence from 1980 to 1991." But NFU does not provide citation to the record to support that contention. Still, our review of the record shows that in its Complaint, Federated alleged that "[s]tray voltage is a single continuous event which constitutes one occurrence that is allocable to one policy year for insurance coverage purposes." That allegation is contrary to the decisions in *Dana I* and *Dana II*.

9. Because we have determined that REMC had no election to make under *Dana II*, we need not address the parties' arguments regarding REMC's assignment because that assignment is only relevant to Federated's contention that pursuant to the assignment, Federated could thereafter elect NFU to pay "all sums."

In addition, we note that the parties' briefs suggest that *Dana II* significantly altered Indiana law. For example, NFU asserts that "[t]he impact of [*Dana II*] is that an insurer, like NFU, from which the insured does not chose [sic] to seek indemnity is not apparently required to do anything. *Dana* permits that insurer to stand by until it is selected by the insured, and if it is not selected until after the insured has been fully compensated by other insurers which have been selected, the insured will have no claim against it." We disagree. Nothing in *Dana I* or *Dana II* purports to abolish Indiana law regarding an insurer's duty to defend or traditional methods by which multiple insurers allocate payment of a loss, including joint and several liability. *See Dana I*, 737 N.E.2d at 1189 (stating "existence of other coverage may affect the amounts payable either under policy terms or equitable principles.").

## II. "Other Insurance" Provision

■ Federated also asserts NFU repudiated its policies when it abandoned REMC and refused to participate in REMC's defense. Because of NFU's alleged repudiation, Federated claims that NFU is estopped from relying on its "other insurance" clause to pro-rate the loss and that Federated is therefore entitled to summary judgment.

■ An insurance company's duty to defend is broader than its duty to indemnify. *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1028 n. 16 (Ind.Ct.App.1999), *trans. denied*. An insurer, after making an independent determination that it has no duty to defend, must protect its interest by filing a declaratory judgment action for a judicial determination of its obligations under the policy or defend its insured under a reservation of rights. *Id.* If it refuses to defend it does so at its peril. *Id.*

In support of its argument that NFU is estopped from relying on its policies, Federated directs us to a footnote, and the cases cited therein, in *Recticel Foam, id.* at 1028 n. 16, in which we stated:

> If an insurer fails to defend under a reservation of rights or to seek a declaratory judgment that there is no coverage and is later found to have wrongfully denied coverage, the insurer may be estopped from raising policy defenses to coverage. *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 237 Ill.Dec. 82, 708 N.E.2d 1122, 1133 (1999). This estoppel doctrine has roots in the principle of equitable estoppel but "arose out of the recognition that an insurer's duty to defend under a liability insurance policy is so fundamental an obligation that a breach of that duty constitutes a repudiation of the contract." *Id.* at 1135. The Seventh Circuit Court of Appeals, interpreting

Indiana law, decided that an insurance company which delayed six months in notifying the insured of its wrongful decision not to defend was barred from denying coverage based on an exclusion. *Federal Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 571 (7th Cir.1997). The *Stroh Brewing* court relied, in part, upon *Indiana Insurance Co. v. Ivetich*, 445 N.E.2d 110, 112 (Ind.Ct.App.1983), where this court stated, "When an insurer induces the insured to effect self-help to protect himself, it cannot then hide behind the language of the insurance policy to avoid its duty to defend or insure."

Although it is undisputed that NFU never participated in REMC's defense, it is also undisputed that NFU has not denied coverage or asserted that it had no duty to defend. Rather, in response to an inquiry from REMC's general counsel, NFU confirmed coverage dates from December 1975 through May 1, 1985. In other words, NFU concedes that its policies were triggered. *See* Brief of Appellee at 20 (NFU "promptly agreed to assist in the defense when [REMC] requested its assistance."). Thus, NFU's conduct here is distinguishable from that of the insurer in *Stroh Brewing*, 127 F.3d at 564, for example, which denied that it had a duty to defend and that its policy covered the insured's loss.

Similarly, as the Supreme Court of Illinois explained in *Ehlco*, 237 Ill.Dec. 82, 708 N.E.2d at 1134–35:

> The general rule of estoppel provides that an insurer which takes the position that a complaint potentially alleging coverage *is not covered* under a policy that includes a duty to defend may not simply refuse to defend the insured. Rather, the insurer has two options: (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage. If the

insurer fails to take either of these steps and *is later found to have wrongfully denied coverage,* the insurer is estopped from raising policy defenses to coverage. (Citations omitted). Again, in this case, NFU has not denied coverage.

Our review of the designated evidence shows that Federated directed the defense of REMC throughout the Fischer litigation. It is not clear why NFU did not become involved with the defense (1) when it received actual notice of the claim against REMC, or (2) when REMC's general counsel wrote NFU and specifically requested that NFU assist in the defense. In his affidavit, James Sutherland, who was the NFU attorney that handled the Fischer litigation, stated only that REMC "never unconditionally tendered the defense to NFU." While we in no way endorse NFU's actions, the bottom line is that NFU has not denied that its policies were triggered or that those policies covered REMC's loss.[10] Thus, Federated's attempt to apply estoppel under these circumstances must fail. We conclude that the trial court did not err when it denied Federated summary judgment on the basis of estoppel.

## CONCLUSION

We conclude that the trial court properly rejected both Federated and NFU's arguments that summary judgment is appropriate under *Dana II.* In addition, the trial court did not err when it denied Federated summary judgment on its theory that NFU had repudiated its policies and is estopped from relying on its "other insurance" provision. We therefore affirm the trial court's determination that summary judgment is improper and remand for further proceedings consistent with this opinion.

Affirmed.

BAKER, J., and MAY, J., concur.

**10.** Indeed, at the summary judgment hearing, the trial court asked NFU's counsel whether NFU's position was that it owed Federated nothing. In response, counsel stated in part, "Well we've never said we don't owe them anything[;] we say we don't owe them the whole thing." On appeal, NFU focuses on *Dana II* and contends that because REMC elected Federated to pay "all sums," and because Federated has paid that amount leaving REMC with no damages, NFU owes nothing. But now that we have determined that the parties' interpretation of *Dana II* is flawed, NFU cannot in good faith claim that it owes nothing when it has conceded that its policies covered REMC's loss.

In addition, although we, like the trial court, are not equipped to allocate the loss at this juncture in the proceedings, we find instructive our decision in *Midwest Mut. Ins. Co. v. Indiana Ins. Co.,* 412 N.E.2d 84, 88–89 (Ind.Ct.App.1980). In that case, we held that where one insurer recognized its obligations and paid a judgment in full on behalf of the insured, that insurer was not "a volunteer" and was entitled to contribution from another insurer whose policy covered the same risk, which resulted in each insurer paying a pro rata amount of the loss.