449 Mass. 621 (2007)                                             621

Allmerica Financial Corporation *v.* Certain Underwriters at Lloyd's, London.

ALLMERICA FINANCIAL CORPORATION & others[1] *vs.* CERTAIN UNDERWRITERS AT LLOYD'S, LONDON.[2]

Worcester. May 8, 2007. - August 6, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Indemnity. Insurance,* Excess Liability Insurance, Coverage, Settlement of claim.

Discussion of the standard of review applicable to a grant of summary judgment in an action involving the interpretation of an insurance contract. [627-628]

This court concluded that the provider of a so-called "follow form" excess insurance policy (meaning that the terms, conditions, and exclusions were the same as those in the primary policy) is not bound by settlement decisions made by a primary insurer, absent an explicit contractual agreement to be so bound. [629-634]

In a civil action for indemnification brought by an insured against the underwriters of its excess insurance policy, the judge erred in granting summary judgment in favor of the underwriters, where factual questions remained on the applicability of the policy's prior claims exclusion [634-636] and its common-law corollary, the "known loss" doctrine [636-638]; for the same reason, the judge properly denied summary judgment on the question of the applicability of the policy's exclusion for promises of future performance [638-640].

CIVIL ACTION commenced in the Superior Court Department on September 30, 2002.

The case was heard by *Peter W. Agnes, Jr.,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Stephen R. Mysliwiec,* of the District of Columbia (*Robert B. Gibbons* with him) for the plaintiffs.

*Fred A. Smith, III,* of Illinois (*David M. Goldhaber,* of Il-

---

[1]Allmerica Financial and Life Insurance and Annuity Company, First Allmerica Financial Life Insurance Company, and SMA Financial Corporation.

[2]Members of Syndicates 1212, 435, 1173, 79, 1207, and 623.

622                                  449 Mass. 621 (2007)

Allmerica Financial Corporation *v.* Certain Underwriters at Lloyd's, London.

linois, *George A. Berman, & Susan E. Cohen* with him) for the defendants.

The following submitted briefs for amici curiae:

*Richard J. Riley & William P. Mekrut* for Complex Insurance Claims Litigation Association.

*Martin C. Pentz & Karen L. Crocker* for Keyspan New England, LLC.

*Joseph P. Dougher & Steven D. Urgo,* of Pennsylvania, for United Policyholders, Inc.

CORDY, J. After the plaintiff Allmerica Financial Corporation, along with its affiliated companies (together, Allmerica), settled a class action lawsuit alleging, inter alia, improper practices in the sale of its life insurance policies, it sought indemnification from its insurers. Allmerica's primary insurer had participated in the settlement negotiations and agreed to pay its policy's limit into the settlement fund. Allmerica also held an excess insurance policy written by the defendants, who are certain underwriters at Lloyd's, London (underwriters). That policy was a so-called "follow form" policy, meaning that its terms, conditions, and exclusions were the same as those in the primary policy. When Allmerica sought indemnification for the settlement beyond the primary policy's limits, the underwriters denied coverage. Allmerica then filed suit seeking a declaration of coverage. Both parties moved for summary judgment. A judge in the Superior Court granted the motion in favor of the underwriters. Allmerica appealed, and we transferred the case here from the Appeals Court on our own motion.

Whether a follow form excess insurer is bound by the decision of a primary insurer to settle a claim is an issue of first impression in the Commonwealth. We conclude, as did the motion judge, that an excess insurer is not bound by settlement decisions made by a primary insurer. We also conclude, however, that factual questions remain on the applicability of the policy's exclusions. Accordingly, we reverse and remand for further proceedings.[3]

1. *Background.* We recount the facts as described in the

---

[3] We acknowledge the amicus briefs submitted by the Complex Insurance Claims Litigation Association; KeySpan New England, LLC; and United Policyholders, Inc.

judge's memorandum, supplemented by the record, reserving for discussion the language of the insurance contracts at issue.

Allmerica is a Massachusetts corporation engaged primarily in the business of life insurance. From July 1, 1997, through July 1, 1998, Allmerica held a primary liability policy written by Columbia Casualty Company (Columbia Casualty).[4] The policy included an "Insurance Company Professional Services Liability" provision, which covered wrongful acts committed by Allmerica and its agents.[5,6] Allmerica also held an excess follow form policy issued by the underwriters and effective over the same term.[7] The follow form language in the underwriters' policy provided that, "[t]his Policy is subject to the same conditions, limitations and other terms . . . as are contained in or may be added to the Policy(ies) of the Primary Insurer(s)." The underwriters' policy had a liability limit of $10 million, which "shall attach only when the Underlying Insurer [Columbia

---

[4]This policy was a continuation of a policy originally effective on August 29, 1996.

[5]The professional services liability provision of the policy at issue provided:

"If during the Policy Period or the Extended Reporting Period, if applicable, any Claim is first reported by the Allmerica Financial Insureds for a Wrongful Act by the Allmerica Financial Insureds or by a person or entity for whom the Allmerica Financial Insureds are legally responsible in the rendering of or failure to render Professional Services, then the Insurer shall reimburse the Allmerica Financial Insureds for Loss resulting from such Claim, provided such Wrongful Act occurred prior to the end of the Policy Period."

The policy defined "Professional Services" as "those services performed by or on behalf of [Allmerica] for a policyholder or third party client pursuant to a contract with such policyholder or client for consideration inuring to the benefit of the Allmerica Financial Insureds." "Wrongful Act" was defined as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty."

[6]Other provisions in the contract covered directors and officers liability, entity securities liability, employment practices liability, and fiduciary liability. These are not at issue in this case.

[7]As with the primary policy, the underwriters' policy was identical to its excess policy originally effective on August 29, 1996. In addition to the underwriters' policy, Allmerica held a further excess follow form policy, with limits effective after the exhaustion of the underwriters' policy, issued by Chubb Atlantic Indemnity Ltd. Nothing in the record indicates that Allmerica made a claim against that policy as a result of the class action settlement. Chubb is not a party to this litigation.

Casualty] shall have paid or have been held liable to pay, the full amount of the Underlying Limit(s)." The underlying limit on the Columbia Casualty policy was $20 million, payable after a self-insured retention amount of $2.5 million. Thus the underwriters' obligation to pay a covered loss would attach after Allmerica had paid its retention amount and Columbia Casualty had paid its $20 million policy limit.

On July 31, 1997, Victor Bussie filed an action against Allmerica in the District Court for Jefferson Parish, Louisiana. That action was voluntarily dismissed. A class action complaint was subsequently filed in the United States District Court for the District of Massachusetts on October 17, 1997 (*Bussie* class action). The final amended complaint alleged that Allmerica, directly and through its agents, engaged in improper practices by making misleading sales presentations using the "vanishing premium" concept, by inducing the systematic and unnecessary purchase of insurance policies using cash value in earlier policies (known as "churning"), by improperly marketing its policies as a savings or investment vehicle, and by using policy illustrations and other sales materials that promised that policies would have a certain cash value after a period of time.[8] *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 65 (D. Mass. 1999) (*Bussie*). The parties eventually reached a settlement, and by memorandum and order dated May 19, 1999, a Federal District Court judge certified a settlement class, approved the settlement agreement, and dismissed the *Bussie* class action. *Id.* at 78-81.

The *Bussie* class action settlement agreement did not provide for the payment of a fixed amount. Rather, the amount owed was to be calculated after an individual review of class members' claims.[9] This involved class members' choosing between two optional methods of relief. Under the first method, class members had the opportunity to submit their claims for review by a panel of neutral adjudicators. To do this, they would submit a claim form describing "the circumstances under which the policies

---

[8]The allegations made in the *Bussie* class action were substantially the same as those made by Victor Bussie in his Louisiana action.

[9]The settlement also required Allmerica to pay the transactional costs of the *Bussie* class action, including the costs of administering the settlement process and the class attorney's fees. *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 75 (D. Mass. 1999) (*Bussie*).

were purchased," along with supporting documentation and any relevant personal declarations. *Bussie, supra* at 73. The agent who sold the policy would complete a similar form describing the sale. The adjudicators would then review each claim individually, assigning it a relief-determining score based on objective criteria. Relief could range from nothing to "an award of relief designed to provide the Claimant with the benefit of his or her bargain or appropriate rescissory relief." *Id.* In approving this method, the judge noted that "Claimants will be able to obtain relief even where they otherwise would not be able to prove each element of a particular legal theory or where that claim might otherwise be barred by a dispositive legal defense." *Id.* Alternatively, class members could elect a second method known as "General Policy Relief." This method "offers each Class member who chooses not to submit a claim to the [neutral adjudicators] an opportunity to obtain — without a showing of fault or damages — an array of relief options," including enhanced policy and annuity benefits. *Id.* at 74. The total cost of the *Bussie* class action and settlement was $39.4 million, including attorney's fees, relief management, and relief payments to class members.[10]

When the *Bussie* class action was filed, Allmerica gave notice to Columbia Casualty. In the meetings and correspondence that followed, Columbia Casualty discussed the details of possible settlements with Allmerica while repeatedly asserting that it did so under reservation of rights; it also advanced funds to cover Allmerica's defense costs. On October 20, 1998, Columbia Casualty wrote to Allmerica indicating its consent to settling the case, and its expectation that it would make an indemnity payment as a result. Columbia Casualty did not, however, admit coverage or liability, "reserv[ing] its rights until such time as we have been able to review the factual data" about the settlement. Thereafter, Allmerica and Columbia Casualty continued to discuss the settlement and related coverage issues. Finally, on August 27, 2001, Allmerica and Columbia Casualty executed a "Settlement Agreement and Release" (agreement) in which Columbia Casualty agreed to pay its policy's limit ($20 million) toward

---

[10]Of these costs, $35.5 million were for attorney's fees and the costs of administering the litigation and the settlement process. Relief payments to class members amounted to $3.9 million.

funding the *Bussie* class action settlement. The agreement included a full release of claims against each other and acknowledged that the "release shall not include any rights or claims for coverage under any excess insurance policies," including the policy issued by the underwriters. The agreement also included a "No Admissions" clause, which provided: "The parties understand and agree that nothing in this Agreement shall be construed or taken as an admission of liability on the part of any of the Parties with respect to the allegations and claims asserted in the [*Bussie* class action], or an admission of coverage or lack of coverage for the claim for coverage submitted by Allmerica under the Policy."

During the pendency of the *Bussie* class action, the underwriters were also in contact with Allmerica. Although not direct participants in the settlement negotiations, the underwriters were apparently provided with periodic reports on their progress. The underwriters at all times reserved their rights as to coverage. By November, 1998, the *Bussie* class action settlement talks were nearing a conclusion. In a letter dated November 4, 1998, the underwriters indicated to Allmerica that they lacked sufficient information to make a coverage determination before a court imposed settlement deadline. To help expedite the settlement, however, the underwriters agreed not to assert Allmerica's failure to obtain their advanced written consent to the settlement as a defense against any claim Allmerica might make.[11]

On January 20, 2000, eight months after the order approving

---

[11]Allmerica asserts in its brief that the underwriters' letter of November 4, 1998, indicated that the underwriters assured it of coverage by saying that they "expected to make an indemnity payment." It made the same assertion before the motion judge. As did the motion judge, we reject Allmerica's interpretation of the letter. The relevant language was, "We look forward to receipt of additional materials regarding the proposed settlement based on our agreement that, assuming that there is covered loss in excess of both the limits of the primary policy and the applicable retention, and assuming that [Columbia Casualty] has paid its full policy limits of $20 million, underwriters would expect to make an indemnity payment in connection with this matter." The underwriters' statement about making a payment is clearly subject to two conditions: its conclusion that the loss is covered, and Columbia Casualty's payment of its policy limit. At no point did the underwriters concede coverage. Accordingly, its statement cannot be interpreted as an assurance of payment. Rather, the underwriters were simply reciting the (undisputed) contractual conditions on their liability to indemnify.

the settlement of the *Bussie* class action had entered, the underwriters sent a letter to Allmerica outlining their position on coverage. The underwriters generally disclaimed coverage for any loss encompassed by the settlement, citing particularly (but without limitation) the policy's exclusion for wrongful acts alleged in claims prior to the effective date of coverage (exclusion III.b) and its exclusion for claims based upon promises of future performance (exclusion III.g).

Allmerica filed suit against the underwriters on September 30, 2002, in the Superior Court. The complaint sought a declaration of coverage and judgment against the underwriters for breach of contract. In their answer, the underwriters denied Allmerica's claims, raised affirmative defenses, and counterclaimed, seeking a declaration of noncoverage. After a period of discovery, the parties filed cross motions for summary judgment. On September 30, 2004, the judge granted summary judgement in favor of the underwriters. In his decision, the judge first concluded that the underwriters were not bound by any actual or implied coverage decision made by Columbia Casualty with respect to the *Bussie* class action settlement. He then turned to the exclusions relied on by the underwriters in denying coverage. While finding that the undisputed material facts were insufficient for summary judgment on the exclusion for promises of future performance, the judge concluded that the underwriters had established that the *Bussie* class action involved wrongful acts alleged in claims made prior to the effective date of the policy. He also found that coverage for the settlement was excluded under the so-called "known loss doctrine," which excludes coverage for losses or probable losses already known by the insured at the time the policy is purchased. See *SCA Servs., Inc.* v. *Transportation Ins. Co.*, 419 Mass. 528, 532-533 (1995). Final judgment entered in the underwriters' favor on February 11, 2005.

2. *Standard of review.* "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410

Mass. 117, 120 (1991), citing Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). "An order granting or denying summary judgment will be upheld if the trial judge ruled on undisputed material facts and his ruling was correct as a matter of law." *Commonwealth* v. *One 1987 Mercury Cougar Auto.*, 413 Mass. 534, 536 (1992), citing *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 556 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue. *Pederson* v. *Time, Inc.*, 404 Mass. 14, 16-17 (1989). Doubts as to the existence of a genuine issue of material fact are to be resolved against the party moving for summary judgment. *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982). Accordingly, we construe any factual disputes or ambiguities in favor of Allmerica.

The primary issues in this case involve the interpretation of an insurance contract, which is a question of law. *Wilkinson* v. *Citation Ins. Co.*, 447 Mass. 663, 667 (2006), citing *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982). An insurance contract is to be interpreted "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *Cody* v. *Connecticut Gen. Life Ins. Co.*, *supra*, quoting *MacArthur* v. *Massachusetts Hosp. Serv., Inc.*, 343 Mass. 670, 672 (1962). Every word in an insurance contract "must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable." *Jacobs* v. *United States Fid. & Guar. Co.*, 417 Mass. 75, 77 (1994), quoting *Wrobel* v. *General Acc. Fire & Life Assur. Corp.*, 288 Mass. 206, 209-210 (1934). Any ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured. *Cody* v. *Connecticut Gen. Life Ins. Co.*, *supra*. "This rule of construction applies with particular force to exclusionary provisions." *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 282 (1997). An insured generally bears the burden of proving that a particular claim falls within a policy's coverage, *Markline Co.* v. *Travelers Ins. Co.*, 384 Mass. 139, 140 (1981), while an insurer has the burden of proving the applicability of a particular exclusion. *Hanover Ins. Co.* v. *Talhouni*, 413 Mass. 781, 785 (1992).

3. *Effect of settlement on the underwriters' obligations.* We first consider whether the underwriters, as excess follow form insurers, were bound by the primary insurer's decision to settle Allmerica's claim for indemnification based on the *Bussie* class action. If they were, we need not reach the underwriters' claim that the settlement was not covered by the policy.

Although the question is one of first impression, this is not the first occasion the court has had to consider elements of the relationship between a primary and an excess insurance policy. In *Vickodil* v. *Lexington Ins. Co.*, 412 Mass. 132 (1992) (*Vickodil*), the insured (who was injured in an accident) had primary coverage of $100,000 and a first-level excess policy with a limit of $1 million. A second-level excess insurer provided coverage of up to $5 million after the first-level excess insurance limit had been exhausted. When the first-level excess insurer became insolvent and could not pay the $1 million, the plaintiffs sued the second-level excess insurer, arguing that, on the insolvency of the former, the insurance limits of the latter should "drop down" to fill the resulting gap.[12] *Id.* at 132-133. We concluded that, absent specific contractual language providing for such a "drop down," the insolvency or other failure to pay of a lower-level insurer would not result in a lowering of the underlying limits of the excess policy. *Id.* at 138. Thus, the plaintiffs in *Vickodil* were left with a gap in insurance coverage. Similar facts and contractual language yielded the same result in another "drop down" case, *Massachusetts Bay Transp. Auth.* v. *Allianz Ins. Co.*, 413 Mass. 473, 474-477 (1992) (*Allianz*).

The "drop down" cases demonstrate a basic point about excess insurance policies: they are separate and distinct contracts from the primary policy. An insurance program involving a primary

---

[12]In *Vickodil* v. *Lexington Ins. Co.*, 412 Mass. 132 (1992), the plaintiffs' argument that the excess policy's limits should "drop down" was based on a purported ambiguity in the excess policy language stating that the excess insurer's liability "shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits." *Id.* at 134-135. There is similar language in the underwriters' policy. That similarity is not important for our purposes here, though, because we are not engaged in interpreting specific contractual language as we were in the *Vickodil* case. Rather, we are interested in the general principles that the result in the "drop down" cases suggest about the relationship between layered insurance contracts.

policy and one or more excess policies divides risk into distinct units and insures each unit individually. The individual insurers do not (absent a specific provision) act as coinsurers of the entirety of the risk. Rather, each insurer contracts with the insured individually to cover a particular portion of the risk. Use of a follow form clause is advantageous in crafting such an insurance program because it makes an excess policy a carbon copy of the primary policy, with the only differences being the names of the parties and the coverage limitations. Follow form language thus allows an insured to have coverage for the same set of potential losses (and with the same set of exceptions) in each layer of the insurance program. The language does not, however, bind the various insurers to a form of joint liability should coverage at a prior layer fail. The layer of risk each insurer covers is defined and distinct.[13]

As *Vickodil* and *Allianz* demonstrate, requiring an excess insurer's coverage to "drop down" would effectively make it a party to the prior layer's contract. This is not what an excess insurer agrees to even when it uses a follow form clause. Allmerica admits as much by calling the underwriters "strangers" to the primary policy. The term "strangers" implies that primary and excess insurers act independently of each other with respect to decisions about their policies, including coverage determinations and settlements.[14] Such independence is reflected in the opinions of courts that have adjudicated disputes involving an excess

---

[13]A more extensive discussion of the nature of excess coverage and the relationship between primary and excess carriers can be found in 23 E.M. Holmes, Appleman on Insurance c. 145 (2d ed. 2004) (excess insurance); and 2 J.W. Stempel, Insurance Contract Disputes c. 16 (2d ed. Supp. 2005) (excess and umbrella insurance coverage). Neither of these treatises contains any discussion of the particular question we address here: whether a follow form excess insurer is bound by a claim settlement reached by the primary insurer when the excess insurer disclaims coverage.

[14]We identify coverage determinations and settlements separately. While decisions to settle are often closely related to an insurer's conclusion that a particular loss is covered, an insurer may decide to settle a claim for other reasons. For example, the settling insurer may conclude that the cost of settlement will be less than the cost of opposing a coverage action in court; or it may value the good will of the insured and settle a claim in the interest of fostering a business relationship that involves many more policies than the one in question. Alternatively, the insurer (although disputing coverage) may acknowledge a duty to defend its insured that effectively consumes the policy limits.

insurer's objections to a settlement reached by a primary (or a prior excess) insurer. In *Allstate Ins. Co.* v. *Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001) (*Allstate*), an automotive parts manufacturer was subject to several environmental cleanup actions. Ultimately the manufacturer settled with all of its insurers except Allstate Insurance Company (Allstate), which had written an excess policy applicable beyond the aggregate limits of a primary policy. *Id.* at 1052. Allstate disputed the extent of its liability by arguing that the settlement had misconstrued the aggregate limit provisions in the primary policy. *Id.* at 1058. The primary insurer intervened, complaining that Allstate, as an excess follow form insurer, "has no business disputing the understanding of the parties [to the primary insurance contract] as to the meaning of the document." *Id.* at 1060. The Supreme Court of Indiana rejected that argument. "Allstate," it wrote, "as an excess carrier, is entitled to rely on the underlying policies in evaluating its risks." *Id.* The primary insurer's decision to settle did not, in other words, bind Allstate, even though the settlement implied a particular construction of the aggregate limits provision.

The United States Court of Appeals for the Third Circuit reached a similar conclusion in *Keystone Shipping Co.* v. *Home Ins. Co.*, 840 F.2d 181 (3d Cir. 1988) (*Keystone Shipping*). In *Keystone Shipping*, a group of insurers settled a substantial claim resulting from a shipping accident on the Delaware River. The group included a primary insurer and four layers of excess insurers. The Home Insurance Company (Home Insurance) had underwritten twenty per cent of the third excess level and the entire fourth excess level. When the other insurers agreed to settle all claims for a total of $30 million, Home Insurance refused to make any payments on the ground that any settlement over $24.8 million was too high. *Id.* at 183. The other insurers executed the settlement in spite of Home Insurance's objections and paid their proportionate shares according to the amounts and layering of their policies. The shipping company then sued Home Insurance for its portion of the settlement. *Id.* The court rejected the shipping company's argument that Home Insurance was obliged to participate if the insured could "establish that it was potentially liable and the amount of the settlement was reasonable." *Id.* at 184. Home Insurance, it concluded, was free not to join the settle-

ment "so long as its own evaluation [of the policy and any pro-
posed settlement] is not unreasonably low and it has acted in
good faith in advancing and adhering to that evaluation in the
absence of a contract which can be construed to impose such an
obligation." *Id.* at 182-183.[15]

The *Allstate* and *Keystone Shipping* decisions are consonant
with our conclusion in the "drop down" cases, all of which re-
spect the right of an insurer to make coverage and settlement
decisions independent of third parties, including other insurers.[16]
Coupled with this right is the risk that the nonsettling insurer
might ultimately face greater liability. As the *Keystone Shipping*
court wrote, "by incurring the greater initial risk of not settling
and so putting [the insured] to the test of establishing its full
claim, Home [Insurance] itself incurred the risk of having to
pay all of [the insured's] recovery over and above the settle-
ment Home's co-insurers proposed." *Id.* at 185-186.[17]

Allmerica urges a different approach to the question. It does
not argue that its policies with Columbia Casualty and the
underwriters are not independent contracts. Rather, it premises
the underwriters' obligation to cover the *Bussie* class action

---

[15]The holding in *Keystone Shipping Co.* v. *Home Ins. Co.*, 840 F.2d 181,
182-183 (3d Cir. 1988) (*Keystone Shipping*), was qualified by a good-faith
limitation. Although that limitation is not strictly relevant here because good
faith is not at issue, it does comport with our own law on the duty an insurer
owes to its insured not to act negligently in refusing to settle a case. *Hartford
Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. 115, 121 (1994).

[16]The court's opinion in *Keystone Shipping, supra,* does not indicate
whether each layer of excess insurance followed the form of the primary
policy. This is unsurprising, as the language of the primary policy was not a
critical question in that case. The dispute was over the extent, not the fact, of
liability. In any case, the holding in *Keystone Shipping* did not depend on
whether the policy language was follow form. Its reasoning applies just as
aptly in either case.

[17]Other Federal and State courts considering the question have reached
similar results. See, e.g., *Interstate Fire & Cas. Co.* v. *Underwriters at Lloyd's,
London,* 139 F.3d 1234, 1237-1238 (9th Cir. 1998) (participation in settlement
negotiations under reservation of rights does not prevent later defense of non-
liability under policy); *Revco D.S., Inc.* v. *Government Employees Ins. Co.,*
791 F. Supp. 1254, 1274 (N.D. Ohio 1991) (in settlement and defense, rights
and responsibilities of primary and follow form excess insurer "separate and
distinct"); *Associated Wholesale Grocers, Inc.* v. *Americold Corp.,* 261 Kan.
806 (1997) (excess insurer has right to challenge reasonable and good faith of
settlement agreement between primary insurer and insured). The parties cite
no case holding to the contrary, nor have we identified any.

settlement on the "follow form" clause. Allmerica argues that the underwriters, by using such a clause, adopted not only the language used by Columbia Casualty to describe the coverage and exclusions in the contract, but also the "intent of the parties to the primary policy." Consequently, Allmerica contends, the underwriters intended to be bound by Columbia Casualty's interpretations of the policy, including any decisions Columbia Casualty might make about coverage and settlement.

This conclusion does not follow from the premise. An excess carrier's intent to incorporate the same words used in a separate agreement between the primary insurer and the insured does not imply an intent by the excess carrier to accept decisions made by the primary carrier about the extent of its obligations under its own agreement. By adopting the form of words used by Columbia Casualty, the underwriters did not also cede to it the right to make decisions about the underwriters' obligation to perform in various circumstances. To conclude otherwise would undermine the distinct and separate nature of each insurer's contract with Allmerica.

Allmerica's argument about the "intent of the parties" arises from a misreading of cases in which a follow form excess insurer has disputed a change in the primary contract made after the effective date of the policy. For example, Allmerica relies on *L.E. Myers Co.* v. *Harbor Ins. Co.*, 77 Ill. 2d 4 (1979) (*L.E. Myers*), a case in which a mutual mistake of fact resulted in the reformation of the policy issued by a primary insurer. The defendant, a follow form insurer, had issued its policy without reading or inspecting the original policy that had included the error. The reformation modified an exclusion, resulting in the claimed loss being covered. The primary insurer settled, but the defendant disclaimed coverage, citing the exclusion as originally written. *Id.* at 6-9. The Supreme Court of Illinois held that the excess insurer was bound to the reformation.[18] *Id.* at 12. It grounded this conclusion in the "[follow form insurer's] lack of concern with the definition of coverage in the primary policy, as evidenced by [its] willingness to issue its own policy without even reading the underlying policy." *Id.* at 9-10.

---

[18]We express no opinion as to whether we would, on similar facts, reach the same conclusion under Massachusetts law.

The *L.E. Myers* case never uses the phrase "intent of the parties." Insofar as it concerns "intent," the case deals with the parties' intent with respect to whether particular words were to have been included in the contract. This is related to, but distinct from, what the parties may have intended regarding the meaning of those words. The meaning of words in an insurance contract, that is, the interpretation of the contract, is a question of law resting ultimately with the court, not the parties. What the parties intended the words to mean becomes relevant only when an ambiguity in the contractual language is apparent. *L.E. Myers, supra,* involved no such ambiguity.[19]

In sum, absent an explicit contractual commitment to do so, an insurer is not bound by the settlement another insurer makes for the same claim, even if the language of the nonsettling policy follows the form of the settling policy. The underwriters were entitled to make a determination concerning the merits of the *Bussie* class action settlement and coverage under its policy independent of that made by Columbia Casualty.[20]

4. *Coverage under the policy.* Having concluded that the underwriters are not bound by the primary insurer's decision to settle with Allmerica, we consider whether the underwriters are entitled to a summary judgment of noncoverage. The parties focus on the prior claims exclusion (exclusion III.b) and its common-law corollary, the known loss doctrine, and on the exclusion for claims based on promises of future performance (exclusion III.g). The exclusions are found in the insurance company professional services liability portion of the Columbia

---

[19]On facts similar to those in *L.E. Myers* v. *Harbor Ins. Co.,* 77 Ill. 2d 4 (1979) (*L.E. Myers*), the United States Court of Appeals for the Ninth Circuit, applying Alaska law (and citing *L.E. Myers* extensively), reached the same conclusion in *R. W. Beck & Assocs.* v. *City & Borough of Sitka,* 27 F.3d 1475, 1482-1483 (9th Cir. 1994) (*Beck & Assocs.*). Like *L.E. Myers, Beck & Assocs.* concerned the "intent" to include or exclude certain words from the contract after it was reformed. Decisions about coverage and settlement were not at issue. The same can be said of two other cases cited by Allmerica: *Great Atl. Ins. Co.* v. *Liberty Mut. Ins. Co.,* 773 F.2d 976, 980-981 (8th Cir. 1985) (applying Missouri law, relying on *L.E. Myers*); and *Playtex FP, Inc.* v. *Columbia Cas. Co.,* 609 A.2d 1087 (Del. Super. Ct. 1991). These cases are unavailing to Allmerica's position for the same reason as *L.E. Myers.*

[20]Our conclusion here should not be construed to limit the settlement responsibilities of insurers articulated in *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.,* 417 Mass. 115 (1994).

Casualty policy, and were adopted by the underwriters through the follow form clause.

a. *Prior claims exclusion.* The prior claims exclusion bars coverage for claims that allege the same or related conduct as a claim made prior to the original effective date of the policy.[21] In 1992, one D.P. Jowers commenced an action (Jowers action) in the Circuit Court for Montgomery County, Alabama. He alleged that an agent of Allmerica had made misrepresentations about the value of his policy (including a "vanishing premium" representation) and that Allmerica had negligently failed to supervise the agent. The underwriters argue that the Jowers action and the *Bussie* class action assert similar allegations constituting "Interrelated Wrongful Acts"[22] that are excluded from coverage.

The underwriters, however, have failed to establish, for purposes of summary judgment, that the Jowers action and the *Bussie* class action were "logically or causally connected" as meant by this exception. The Jowers action complaint alleged misrepresentations by a particular agent, and accused Allmerica of negligent failure to supervise that agent. In contrast, the *Bussie* class action alleged a scheme of misrepresentations perpetrated by Allmerica through its agents. *Bussie, supra* at 65. While these two cases do share a similarity, in that both allege misrepresentations about the future cash value of the policies sold, that similarity is not sufficient to establish that these cases involved a "common fact, circumstance, situation, transaction or event" as required under the policy exclusion. Commonality is a more

---

[21]The relevant language of the prior claims exclusion provides: "[T]he Insurer shall not be liable to pay any Loss . . .

"b. based upon, directly or indirectly arising out of, or in any way involving:

"(1) any Wrongful Act or any matter, fact, circumstance, situation, transaction or event which has been the subject of any Claim made against the Allmerica Financial Insureds prior to the Original Effective Date as stated in Item 8. of the Declarations; or

"(2) any other Wrongful Act whenever occurring, which, together with a Wrongful Act which has been the subject of such Claim, would constitute Interrelated Wrongful Acts." The original effective date was August 29, 1996. See notes 4 and 7, *supra.*

[22]The policy defines "Interrelated Wrongful Acts" to include "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event."

demanding requirement than similarity. As Allmerica notes, the alleged wrongdoing in Jowers and *Bussie* "took place at different times and locations, and involved different policyholders, different sales agents, and separate transactions." While we cannot say that the underwriters will be unable to show that the claims were "interrelated" in any circumstances, they have not done so on the record before us. Summary judgment for underwriters on this ground should have been denied.

b. *Known loss doctrine.* We also reject the underwriters' argument that coverage of the *Bussie* class action is barred by the known loss doctrine.[23] In *SCA Servs., Inc.* v. *Transportation Ins. Co.*, 419 Mass. 528 (1995) (*SCA Servs.*), we noted that "the basic purpose of insurance is to protect against fortuitous events and not against known certainties. Parties wager against the occurrence or nonoccurrence of a specified event; the carrier insures against a risk, not a certainty." *Id.* at 532, citing *Bartholomew* v. *Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981). Under the known loss doctrine, "the insurable risk is eliminated where an insured knows, when it purchases a policy, that there is a substantial probability that it will suffer or has already suffered a loss. At that point, the risk ceases to be contingent and becomes a probable or known loss." *SCA Servs., supra* at 532-533. Thus in *SCA Servs.*, we affirmed summary judgment of noncoverage where the insured "had full knowledge of the probable loss for which it later sought a defense and indemnification." *Id.* at 533-534.

The underwriters argue that the known loss doctrine applies because "Allmerica knew of hundreds of 'Bussie type' vanishing premium losses prior to the inception of coverage." The record, however, does not support this contention. Although Allmerica knew when it purchased the excess policy that it faced multiple individual vanishing premium claims, and as part of its policy application disclosed both the specific claims against it

---

[23]The prior claims exclusion in the policy is effectively a contractual statement of the known loss doctrine, albeit one whose details are framed by the language chosen by the parties rather than being implied under the common law. See *United States Liab. Ins. Co.* v. *Selman*, 70 F.3d 684, 690 (1st Cir. 1995) ("There are two iterations of the known loss doctrine. The doctrine exists both as a function of the standard general liability insurance contract and at common law").

and the fact that "vanishing premium" claims were being litigated against others in the industry, Allmerica had not admitted to or been adjudicated to have made "vanishing premium" misrepresentations. In other words, Allmerica had knowledge of possible and actual claims (which it disclosed), but not probable or actual losses. Further, its general awareness of "vanishing premium" lawsuits would not be sufficient to give Allmerica actual or constructive knowledge that the *Bussie* class action in particular (which had not been filed) constituted a likely loss. While most sophisticated insureds will have some idea of the sorts of claims they may face, that is not the same as knowing of the existence or merits of a particular claim.

Were we to accept the underwriters' argument, we would be applying the known loss doctrine more expansively than the narrow interpretation suggested by the facts in *SCA Servs, supra.* In that case, a nuisance claim by local residents resulted in findings that a waste disposal operation had caused extensive contamination of groundwater and other environmental pollution. A court ordered the site closed. *Id.* at 529-530. Two years after that order (but before it was affirmed on appeal) the operator purchased a liability insurance policy. *Id.* at 532. After local residents later brought suit for damages, we concluded, based on the known loss doctrine, that the insurer had no duty to indemnify. *Id.* at 533-534. We noted that the operator's "knowledge [went] beyond simply knowing that there was environmental contamination and that its landfill was the probable source of this contamination. [The operator] knew that the residents . . . were damaged by the operation of the site. Therefore, the nuisance for which [the operator] sought personal injury coverage was not only a known but an adjudicated fact at the time [the operator] purchased the insurance and thus was uninsurable." *Id.* at 534.

In contrast, the underwriters' policy was in effect before the *Bussie* class action was filed. Unlike those in *SCA Servs.*, the claims in *Bussie* were not known, much less adjudicated, at the time Allmerica purchased its policy. While a prior adjudication may not be necessary to implicate the known loss doctrine, its centrality to our analysis in *SCA Servs.* suggests a greater degree of certainty of loss than the underwriters argue is required. The

United States Court of Appeals for the First Circuit took a similar view of *SCA Servs.* in *United States Liab. Ins. Co.* v. *Selman,* 70 F.3d 684, 691 (1st Cir. 1995) (*Selman*), holding that, under Massachusetts law, "the known loss doctrine only applies when the insured actually knows on or before the effective date of the policy either that a loss has occurred or that one is substantially certain to occur." *Selman* is consistent with our view of the proper narrow construction of the known loss doctrine. Considered through this lens, the undisputed fact that Allmerica faced "vanishing premium" lawsuits was not sufficient to convert any particular case (including the *Bussie* class action) from a risk of loss to a probable or a certain one.[24] The summary judgment record does not support denial of coverage based on the known loss doctrine.

c. *Promises of future performance exclusion.* The professional services liability provision of the policy covers the acts of Allmerica's agents in rendering professional services. See note 5, *supra.* The exclusion for promises of future performance bars coverage of any claim involving a representation about the past performance or future value of an insurance product.[25] This exclusion has an important exception for actions of agents "acting independent of the Allmerica Financial Insureds," meaning that the exclusion does not apply to claims based on unauthorized representations made by agents "in conjunction with [Allmerica's] authorized marketing materials."[26] Allmerica's liability to the members of the class, however, is not dependent

---

[24]Indeed, up to the point of settlement, Allmerica apparently believed that it could successfully defend against the *Bussie* class action allegations. See *Bussie, supra* at 66. The judge approving the settlement even noted that the class faced "[p]otentially [s]ignificant [o]bstacles to [r]ecovery at [t]rial." *Id.* at 76.

[25]The exclusion provides that the insurer shall not be liable for any claims "based upon, directly or indirectly arising out of or in any way involving any of the Allmerica Financial Insureds' actual or alleged oral or written representation, promise or guarantee of the past performance or future value of any insurance product or investment product, provided this Exclusion shall not apply to any Claim arising out of a representation, promise or guarantee of a Contract Agent acting independent of the Allmerica Financial Insureds; including representations not authorized by the Allmerica Financial Insureds and made by the Contract Agent in conjunction with the Allmerica Financial Insureds' authorized marketing materials."

[26]It appears to be undisputed that Allmerica's marketing materials were accurate and not the basis of the *Bussie* claims.

449 Mass. 621 (2007) 639

Allmerica Financial Corporation v. Certain Underwriters at Lloyd's, London.

on whether its agents were acting independent of Allmerica in making representations about the past performance or future value of its policies, or at its direction. *Shumway* v. *Home Fire & Marine Ins. Co.*, 301 Mass. 391, 393-394 (1938) (insurer liable for agents acting with its apparent authority). It is the underwriters' obligation to indemnify Allmerica that turns on this distinction.

The underwriters contend that the exception does not apply because the *Bussie* class action "involved an alleged company-wide scheme perpetrated by Allmerica on its Policyholders rather than a case about individual agent misconduct." Consequently, it can be presumed that claims settled in the *Bussie* class action involved representations properly attributable to Allmerica under the policy, and not to agents acting independently of it. The order of the Federal court approving the *Bussie* class action settlement did not, however, make any factual or legal conclusions about the validity of the allegations in the complaint. Rather, it provided that nothing in the order or the settlement "may be construed as, or may be used as an admission or concession by or against Allmerica . . . of the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever." *Bussie, supra* at 81. In other words, in agreeing to settle, Allmerica was not stipulating to the truth of the allegations. The settlement order therefore does not prevent Allmerica from contending in an action for indemnification that any improper representations were made by agents acting independent of Allmerica and not at its direction.[27] In other words, the *Bussie* complaint and the settlement order do not resolve the question of the applicability of the exception and the consequent duty of the underwriters to indemnify. *Travelers Ins.*

---

[27] The underwriters argue that Allmerica's stipulation to the settlement order and the certification of a settlement class under Fed. R. Civ. P. 23(b)(3) binds it to the facts as alleged in the complaint. This is not the case here. Collateral estoppel only applies where "an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." *Fireside Motors, Inc.* v. *Nissan Motor Corp. in U.S.A.*, 395 Mass. 366, 372 (1985), quoting Restatement (Second) of Judgments § 27 (1982). The issues actually determined by the certification and order in *Bussie, supra*, were procedural questions about the commonality of the claims. Insofar as the judge made any substantive conclusions, they concerned the fairness of the settlement, not the factual merits of the underlying claims.

*Co.* v. *Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir. 1989), citing *Newell-Blais Post # 443, Veterans of Foreign Wars of the U.S., Inc.* v. *Shelby Mut. Ins. Co.*, 396 Mass. 633 (1986) (facts, not allegations in complaint, control duty to indemnify).

We agree with the motion judge that the "ultimate issue of whether these representations by Allmerica's sales agents were authorized by Allmerica is a material question of fact that remains unanswered" in the summary judgment record. Consequently, summary judgment was properly denied for both parties on this issue.

5. *Conclusion.* The denial of Allmerica's motion for summary judgment is affirmed. Summary judgment for the underwriters is reversed. The case is remanded to the Superior Court for further proceedings in accordance with this opinion.

*So ordered.*