## LES Realty Trust 'A' & others[1] vs. Landmark American Insurance Company.

No. 11-P-747.

Suffolk. February 6, 2012. - October 24, 2012.

Present: Cohen, Brown, & Fecteau, JJ.

*Insurance,* Amount of recovery for loss, Construction of policy, Excess liability insurance. *Contract,* Insurance.

In an insurance coverage dispute brought in the Superior Court by four owners and one operator of properties severely damaged during a hurricane, the judge, in granting summary judgment to the excess insurer, correctly concluded that the excess insurer's liability under the excess policy was limited to the stated values of the damaged properties less the amounts paid by the primary insurer, rather than the full stated values, where, viewed in light of established principles of interpretation requiring consideration of the policy in context and as a whole, the policy functioned as an excess policy in the usual sense, in that it required the plaintiffs to maintain their primary coverage in full effect and limited the excess insurer's liability to the stated values, even in instances of "drop down" coverage (i.e., where coverage is provided in excess of a reduced or unavailable primary limit). [696-700]

Civil action commenced in the Superior Court Department on July 27, 2007.

The case was heard by *Judith Fabricant,* J., on motions for summary judgment, and entry of separate and final judgment was ordered by her.

*Finley T. Harckham,* of New York, for the plaintiffs.

*David O. Brink* for the defendant.

Cohen, J. The plaintiffs, four owners and one operator of two Louisiana apartment complexes that were severely damaged in August, 2005, during Hurricane Katrina, appeal from the grant

---

[1] LES Limited Partnership 'A,' LES Realty Trust 'B,' LES Limited Partnership 'B,' and LJS Management Corporation.

of summary judgment to their excess insurer, the defendant, Landmark American Insurance Company (Landmark).[2] At issue is the motion judge's ruling that Landmark's liability under an excess insurance policy is limited to the stated values of the damaged properties, less the limits paid by the primary insurer, rather than the full stated values, as contended by the plaintiffs. We affirm.

Our review is de novo, not only because this appeal arises on summary judgment, see *Bardige* v. *Performance Specialists, Inc.*, 74 Mass. App. Ct. 99, 101-102 (2009), but also because the interpretation of an insurance policy presents a question of law. See *Wilkinson* v. *Citation Ins. Co.*, 447 Mass. 663, 667 (2006). Our task is aided, however, by the motion judge's thorough and thoughtful memorandum of decision.

In brief, the dispute may be summarized as follows. Commencing in 2004, Landmark provided excess coverage[3] for the plaintiffs' properties on a scheduled basis, insuring the various locations for specific amounts as reported by the plaintiffs.[4] The "Excess Physical Damage Schedule" of the policy lists the primary insurance and underlying excess limits as "$2,500,000 per occurrence," and the limit insured as "$100,000,000 per occurrence, not to exceed value reported." The stated values of the two Louisiana apartment complexes were reported and scheduled at a combined total of $8.7 million. It is not disputed that the plaintiffs' losses exceeded $8.7 million; nor is it disputed that the plaintiffs already have recovered $8.7 million from their insurance program: their primary insurer paid its entire "per occurrence" limits of $2.5 million, and Landmark paid $6.2 million under its excess policy. At issue is whether Landmark owes an

---

[2]The plaintiffs also own and operate numerous other properties that are located in Massachusetts, and the plaintiffs each have a place of business here.

[3]The policy form is labeled "Excess Physical Damage Coverage Form." See *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492, 498 (1988). It covers designated perils "which are also covered by and defined" in specified primary policies and requires that the primary and any underlying excess policies be maintained in full effect.

[4]In the past, the plaintiffs had been insured on a so-called "blanket" basis. Claims by the plaintiffs against their insurance brokers for allegedly failing to continue to obtain blanket coverage have been resolved separately and are not before us.

additional $2.5 million. According to the plaintiffs, payment of the primary policy limits merely triggered, but did not reduce, Landmark's obligation to pay up to the full amount of the stated values for the damaged properties. Thus, under the plaintiffs' view, they are entitled to a total recovery from their insurers of $11.2 million on properties with scheduled values of $8.7 million.

We observe at the outset that the plaintiffs' reading of the policy is at odds with the usual operation of excess coverage, which typically insures "loss that exceeds the amount of coverage under another policy." *Boston Gas Co.* v. *Century Indem. Co.*, 454 Mass. 337, 340 n.7 (2009), quoting from Black's Law Dictionary 816 (8th ed. 2004). As between primary and excess policies, "[t]he layer of risk each insurer covers is defined and distinct." *Allmerica Financial Corp.* v. *Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 630 (2007). As explained by the Supreme Judicial Court:

> "An insurance program involving a primary policy and one or more excess policies divides risk into distinct units and insures each unit individually. The individual insurers do not (absent a specific provision) act as coinsurers of the entirety of the risk. Rather, each insurer contracts with the insured individually to cover a particular portion of the risk."

*Id.* at 629-630.

Furthermore, the plaintiffs' analysis depends upon "cherry-picking" two provisions — the definition of "ultimate net loss" and the scheduled limit of liability endorsement as it appears in their 2004 policy — and viewing them in isolation from other related policy terms.[5] This is contrary to well-established principles of policy interpretation requiring that we consider

---

[5]For present purposes, we accept the plaintiffs' premise that because Landmark had agreed to renew coverage for 2005 on the same terms as those in effect in 2004, the governing terms are those contained in their 2004 policy. As we conclude that there is no merit to the plaintiffs' position even under the terms of the 2004 policy, we need not consider Landmark's argument that the receipt by the plaintiffs' broker of a binder for the 2005 policy bound the plaintiffs to a revised scheduled limit of liability endorsement expressly stating that the liability of the insurer to pay the stated value of a property would be reduced by primary and underlying excess limits.

policy provisions in context and in light of the policy as a whole. See, e.g., *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492, 499 (1988); *Sullivan* v. *Southland Life Ins. Co.*, 67 Mass. App. Ct. 439, 442-443 (2006). Viewed in light of these principles, neither the definition of "ultimate net loss" nor the scheduled limit of liability endorsement detracts from the clear and unambiguous intent of the excess policy to cover only that portion of the scheduled values that exceeded the primary policy limits.

The definition of "ultimate net loss" and the two preceding paragraphs together set forth the basic parameters of the policy's "Excess Physical Damage Coverage Form":

"1. Insuring Clause:

"Subject to the limitations, terms and conditions contained in this Policy or added hereto, the Company agrees to indemnify the Insured named in the schedule herein in respect of direct physical loss or damage to the property described in the schedule while located or contained as described in the schedule, occurring during the period stated in the schedule and caused by any of such perils as are set forth in Item 3 of the schedule, and which are also covered by and defined in the policy(ies) specified in the schedule and issued by the Primary Insurer(s) stated therein.

"2. Limit:

"Provided always that liability attaches to the Company only after the primary and underlying excess insurer(s) have paid or have admitted to liability for the full amount of their respective ultimate net loss liability as set forth in Item 6 of the schedule and designated 'Primary and Underlying Excess Limit(s)'[6] and then the limits of the Company's liability shall be those set forth in Item 7 under the designation 'Limit Insured'[7] and the Company shall be liable to pay the ultimate net loss up to the full amount of such 'Limit Insured.'

---

[6]Item 6 of the "Excess Physical Damage Schedule" lists the following: "Primary Limits and Underlying Excess Limits: $2,500,000 Per Occurrence."

[7]Item 7 of the "Excess Physical Damage Schedule" lists the following: "Limit Insured: $100,000 Per Occurrence, not to exceed value reported and $7,500,000 Annual Aggregate each as respects Flood and Earthquake."

> "3. Definitions:
>
> "(a) Loss: The word 'loss' shall mean a loss or series of losses arising out of one event or occurrence.
>
> "(b) Ultimate Net Loss: The words 'ultimate net loss' shall mean the loss sustained by the Insured as a result of the happening of the perils covered by this Policy after making deductions for all salvages, recoveries and other valid and collectible insurance *other than recoveries under the policy(ies) of the primary and underlying excess insurer(s)*" (emphasis added).

Although the plaintiffs argue that the emphasized phrase in the definition of "ultimate net loss" means that Landmark is liable for the entire ultimate net loss without any deduction for amounts paid by the primary insurer, this interpretation is not reasonable. The definition does not purport to address Landmark's *liability* for ultimate net loss; that issue is addressed in the preceding paragraph, entitled "Limit," which makes clear that Landmark's liability attaches after the primary and any other underlying insurers pay their respective portions of the ultimate net loss, and will not exceed the value reported.

The plaintiffs' reliance on the scheduled limit of liability endorsement is equally misplaced. That endorsement provides in relevant part:

> "1. In the event of loss hereunder, liability of the Company shall be limited to the least of the following in any one 'occurrence':
>
> > "a. The actual adjusted amount of the loss, less applicable deductibles;
> >
> > "b. 100% of the individually stated value for each scheduled item of property insured at the location which had the loss as shown on the latest Statement of Values on file with this Company, less applicable deductibles. If no value is shown for a scheduled item then there is no coverage for that item; or
> >
> > "c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy."

Properly understood, the limit of liability endorsement sets the upper limits of Landmark's liability; it does not, in itself, purport to change the nature of the policy from one providing excess coverage to one providing overlapping coverage.[8] This interpretation of the scheduled limit of liability endorsement is confirmed by the policy's "drop down" provision,[9] which immediately precedes it. Entitled "Excess Limit of Liability 'Drop Down' Clause," it states as follows:

> "It is agreed that in the event of reduction or exhaustion of the underlying aggregate limit or limits, such insurance as is afforded by this Policy shall apply in excess of the reduced underlying limit, or if such limit is exhausted, shall apply as underlying insurance, notwithstanding anything to the contrary in the terms and conditions of this Policy.

> "It is further understood that, in the event of exhaustion of the underlying aggregate limit or limits, the deductible applicable to coverage provided by this Policy for the peril(s) for which underlying limit(s) have been exhausted shall be the same as the deductible(s) stated in the primary policy.

> "In no event, however, shall this Company be liable for more than the limits of liability, as specified in Item 7 of the Excess Physical Damage Schedule.

> "It is a condition of this Policy that the Policy(ies) of the primary and underlying excess insurers shall be maintained in full effect during the currency of this Policy except for any reduction or exhaustion of the aggregate limits contained therein solely by payment of losses during the Policy year."

Were we to accept the plaintiffs' interpretation of the scheduled

---

[8]The 2005 modification to the endorsement does not affect our analysis. Although the modification provided useful clarification, it did not alter the plain meaning of the policy.

[9]The function of a drop down clause in an excess policy is to fill in coverage where the underlying policy limit has been reduced or becomes unavailable. See *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. 598, 600 (1987). See also *Metropolitan Leasing, Inc.* v. *Pacific Employers Ins. Co.*, 36 Mass. App. Ct. 536, 537 (1994).

limit of liability endorsement, the operation of the drop down clause would be incongruous. If, as the plaintiffs contend, they are entitled to recover from Landmark 100 percent of the stated value of the damaged properties even after the $2.5 million primary policy limits have been paid, they would be afforded excess coverage in the full amount of the stated values in situations where the primary policy has been paid in full, even though, in drop down situations, they would be afforded coverage only in excess of the reduced underlying limits.

"An interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable." *Worcester Mut. Ins. Co.* v. *Marnell*, 398 Mass. 240, 245 (1986), quoting from *Sherman* v. *Employers' Liab. Assurance Corp.*, 343 Mass. 354, 357 (1961). Thus, the provisions on which the plaintiffs rely must be read in conjunction with the requirement that the plaintiffs maintain their primary coverage in full effect, and with the drop down clause limiting Landmark's liability to the scheduled values and making clear that even in instances of drop down coverage, Landmark's liability will not exceed the stated value of damaged property. When we do so, it is readily apparent that Landmark's policy functions as an excess policy in the usual sense, and that Landmark has fully paid its share of the losses sustained by the plaintiffs.

*Judgment affirmed.*